**EXHIBIT A**

*1802*

AGREEMENT FOR HOTEL RESTAURANT MANAGEMENT SERVICES

Between

150 EAST 34TH STREET RESTAURANT MANAGEMENT CO. LLC,

Tenant,

and

LISA RESTAURANT, INC.,

Manager

*Barking Dog*

Restaurant:

**Restaurant Premises**
**Dumont Plaza Hotel**
**150 East 34th Street**
**New York, New York**

197178-11w

AGREEMENT FOR HOTEL RESTAURANT MANAGEMENT SERVICES, made as of the 15th day of May, 2002 by and between 150 EAST 34th STREET RESTAURANT MANAGEMENT CO., LLC, a New York limited liability company ("Tenant"), and LISA RESTAURANT, INC., a New York corporation ("Manager").

## WITNESSETH:

WHEREAS, 150 East 34th Street Co., LLC, being the owner (the "Owner") of that certain building located at 150 East 34th Street, New York, New York (the "Building") known and operated as The Dumont Plaza Hotel (the "Hotel"), has entered into that certain Hotel Restaurant Lease, dated of even date herewith, with Tenant (the "Restaurant Lease") for the operation of a restaurant and bar (the "Restaurant") located on the first floor of the Hotel (the "Premises"), all as more particularly shown on the attached Exhibit A hereto, and

WHEREAS, the Tenant desires to hire and retain Manager to operate and manage the Restaurant at the Premises; and

WHEREAS, the Manager desires to operate and manage the Restaurant on the terms and conditions set forth herein;

NOW, THEREFORE, Tenant and Manager, for themselves, their legal representatives, and permitted successors and assigns, hereby covenant as follows:

1.    BASIC TERMS.

A.    Manager hereby agrees to operate and manage the Restaurant for and on behalf of the Tenant upon the terms and conditions set forth herein for the Term, commencing on the Commencement Date and ending on the Expiration Date, both dates inclusive, unless the Term shall sooner end pursuant to any of the terms, covenants or conditions of this Agreement or pursuant to law. The "Commencement Date" shall be the date that Tenant delivers possession of the Restaurant Premises (by delivery of the keys thereto), which shall be not less than five (5) nor more than ten (10) days after the execution and delivery of this Agreement.

B.    Manager shall deposit all revenues from the operation or management of the Restaurant from each day of operations in a bank account designated by Tenant promptly on the morning of the next business day. Tenant will retain (x) the portion of such revenues that constitute gross proceeds from the sales of liquor or other alcoholic beverages by the Restaurant ("Gross Liquor Revenues"), (y) sufficient funds to purchase any and all alcoholic beverages required for the Restaurant (which shall be paid in full C.O.D. or within thirty (30) days of delivery), and (z) sufficient funds to timely pay any and all sales taxes upon sales of food and beverages, including alcoholic beverages in the Restaurant, and promptly remit the balance of the revenues in such account to an account of Manager (the "Revenue Balance"). In no event shall Manager be entitled to retain, nor shall Tenant transfer to Manager, any Gross Liquor Revenues from the operation of the Restaurant. Funds retained in the Tenant account for the purpose of paying sales taxes shall be transferred to a separate account established by Tenant

197178-11w                                         1

("Sales Tax Account") on an on-going basis but no less frequently than monthly by the third business day of each month with respect to sales in the preceding month in order to timely pay all sales taxes due form Restaurant operations. Manager and Tenant shall not use the Sales Tax Account for any purpose other than for payment of applicable sales taxes. Manager shall pay and be solely responsible for (i) all Operating Expenses of the Restaurant (as defined below) and other costs associated with Manager's activities or business, other than the purchase of alcoholic beverages for the Restaurant, (ii) the Tenant Fixed Fee (defined below), and (iii) any Additional Charges (defined below), with any excess remaining after paying such expenses constituting the Manager's "Management Fee", which amount shall be Manager's sole compensation for its services rendered hereunder. As used herein, "Operating Expenses" means all food, inventory and supply costs associated with the operation of the Restaurant, all salary, wage or other labor costs of Manager's employees or personnel, and all utility, service or other costs associated with the operation of the Restaurant, including but not limited to any other costs or expenses expressly identified in this Agreement as an Operating Expense, but specifically excluding any expense for alcoholic beverages purchased for the Restaurant, which shall paid directly by Tenant. Manager shall pay all Operating Expenses of the Restaurant, the Tenant Fixed Fee (as provided below) and all Additional Charges notwithstanding whether or not the Revenue Balance is sufficient to pay such amounts, and Tenant shall have no liability therefor.

     C.    In consideration for its right to manage the Restaurant as provided hereunder, Manager shall pay to Tenant, on the first day of each month during the term hereof, the Tenant Fixed Fee (defined below), without any set-off, offset, abatement or deduction whatsoever except as otherwise expressly provided under this Agreement, and any and all Additional Charges, including but not limited to the amount of escalations chargeable relating to increases in Taxes pursuant to Article 28 hereof, as the same is adjusted from time to time pursuant to Article 28 . The "Tenant Fixed Fee" is as follows:

    $5,416.67 per month, from the Commencement Date through April 30, 2003;
    $6,695.00 per month from May 1, 2003 through April 30, 2004;
    $6,895.85 per month from May 1, 2004 through April 30, 2005;
    $7,102.73 per month from May 1, 2005 through April 30, 2006;
    $7,315.81 per month from May 1, 2006 through April 30, 2007;
    $7,535.29 per month from May 1, 2007 through April 30, 2008;
    $7,761.34 per month from May 1, 2008 through April 30, 2009;
    $7,994.19 per month from May 1, 2009 through April 30, 2010;
    $8,234.01 per month from May 1, 2010 through April 30, 2011;
    $8,481.03 per month from May 1, 2011 through April 30, 2012;
    $8,735.46 per month from May 1, 2012 through April 30, 2013;
    $8,997.53 per month from May 1, 2013 through April 30, 2014;
    $9,267.45 per month from May 1, 2014 through April 30, 2015;
    $9,545.48 per month from May 1, 2015 through April 30, 2016; and
    $9,831.84 per month from May 1, 2016 until the April 30, 2017 (the "Expiration Date").

    Notwithstanding the foregoing, the Tenant Fixed Fee shall not be due and payable for the five (5) consecutive months beginning on the first day of the first month after the Manager has

completed its Initial Work (as defined herein) and has opened the Restaurant to the public. However, Manager shall pay the Tenant Fixed Fee during the period from the Commencement Date through the end of the month in which the Initial Work is completed and the Restaurant is opened to the public.

D.      Manager shall also pay to Tenant, when due, the amount of any Additional Charges payable under the terms of this Agreement. "Additional Charges" are any and all expenses or charges payable by Manager to Tenant hereunder other than the Tenant's Fixed Fee.

E.      Tenant will hire John Hawkins as a consultant in accordance with the terms and conditions of that certain Consulting Agreement of even date herewith (the "Consulting Agreement"). Pursuant to the terms of such Agreement, the "Consultant" (as defined therein) will serve as an assistant vice president of Tenant whose duties are to administer the revenues received from the Manager in accordance with this Article 1 or as otherwise required by the Tenant in accordance with the terms of this Agreement, and to prepare and cause to be timely filed any and all sales tax returns for Tenant and cause Tenant to pay in a timely manner applicable sales taxes with respect to the Restaurant's activities; provided, however, that sales taxes shall be paid out of the Sales Tax Account. In consideration of such services and other services provided in the Consulting Agreement, Consultant will be paid a consulting fee as provided in the Consulting Agreement equal to the amount of the Gross Liquor Revenues (the "Consulting Fee"). Tenant hereby acknowledges that Consultant is the sole owner of Manager and will be employed by or perform services for Manager at the Restaurant. Tenant acknowledges that Consultant's dual status as consultant to Tenant owner and employee of Manager may give rise to conflicting loyalties and conflicts of interest, but Tenant agrees that such conditions shall not give rise to a claim or cause of action hereunder, constitute a breach of this Agreement or constitute grounds for termination of Consultant's employment under the Consulting Agreement so long as Consultant is performing his duties as required under the terms and conditions of the Consultant Agreement and administering the revenues from the Restaurant as required by Section 1.B hereof and performing any other duties expressly assigned to him under Section 1 or other provision of this Agreement in accordance with the terms and conditions of this Agreement.

F.      Manager shall have the sole and absolute right to manage the Restaurant on a day to day basis and to determine all of the business policies applicable to the operation of the Restaurant in the same manner as if Manager were the sole owner thereof, subject only to compliance with all applicable law and to the express terms of this Agreement. Manager shall in its sole discretion shall hire, supervise, direct, discharge and determine the compensation, other benefits and terms of employment of personnel managing and operating the Restaurant. Manager shall comply with Article 40.H hereof and all applicable law in connection with such employment. It is expressly understood and agreed that Restaurant personnel are in the sole employ of and are the sole responsibility of Manager and are not in the employ of Owner or Tenant. Notwithstanding anything in this Agreement to the contrary, at any time Tenant shall have the right, subject to applicable law and existing labor agreements, for good cause shown to require that any personnel be removed from the provision of services on behalf of the Hotel (such as room service) by giving Manager five (5) days prior notice thereof, provided, however, such personnel may nevertheless be employed at the Restaurant.

G.      Tenant will use its best efforts, at its sole cost and expense, to obtain a liquor license for the Restaurant Premises. Manager will cooperate with Tenant in obtaining a liquor license for the Restaurant Premises and in particular, will provide information pertaining to its intended alteration of the Premises necessary to obtain approval for Tenant's liquor license, and not commence any alterations to the Premises that require approval of the alcoholic beverage control authorities of the State of New York prior to obtaining such approval. Manager acknowledges that the liquor license pertaining to the Hotel will be solely owned by Owner and that a separate liquor license for the Restaurant Premises will be solely owned by Tenant. No later than two (2) months after Tenant obtains its liquor license for the Restaurant, Tenant will use commercially reasonable efforts to have Tenant's liquor license permit service of alcoholic beverages in a limited area of the public plaza adjacent to the Restaurant Premises, as shown in Exhibit A hereto (the "Plaza"). In connection therewith, Tenant shall also take such steps as are necessary to secure approval of the New York City Planning Commission to permit the Restaurant to serve food and beverages in such limited area of the Plaza. However, Tenant makes no representation or warranty that such an extension of its liquor license will be obtained, and Tenant hereby represents that it has been advised by counsel that it is unlikely that Tenant will be able to obtain an extension of its liquor license to permit service of alcoholic beverages in the Plaza. Failure to obtain either (i) such an extension of Tenant's liquor license, or (ii) the approval of the City Planning Commission to the use of the limited area of the Plaza for Restaurant purposes shall reduce the amount of the Tenant Fixed Fee by 16.6667 percent of the amount stated above in Section C (e.g., $6,695 shall become $5,579.16) effective May 1, 2003, but shall not alter or diminish Manager's obligation to pay any Additional Charges, or any other obligation of Manager to be performed hereunder. Manager agrees that it shall not at any time during the Term take or permit to be taken or suffer any actions which are prohibited by the alcoholic beverage control authorities of the State of New York or any other Legal Requirements pertaining to the purchase or sale of alcoholic beverages, including, but no limited to advertising relating thereto. In addition to all other rights or remedies provided in this Agreement, Manager shall indemnify and hold Owner and Tenant harmless from any loss, cost, tax, penalty or expense (including without limitation reasonable legal fees and costs) of whatsoever nature relating to Manager's sale and/or service of liquor. Manager shall not serve alcoholic beverages in the Restaurant Premises unless and until Tenant obtains a liquor license therefor, nor shall Manager serve or permit alcoholic beverages in the Plaza unless and until the Tenant's liquor license is amended to permit such service.

H.      Subject to Article 40.P hereof, Tenant represents and warrants that as of the date that the Restaurant has completed its Initial Work and opens for business to the public, the Owner's and Tenant's liquor licenses will be in full force and effect; provided, however, that if, and so long as, Tenant's liquor license is not in effect, Manager shall not be required to pay the Tenant Fixed Fee; however, neither Owner nor Tenant shall have any liability for consequential, incidental or other damages relating to or arising from Tenant's failure to have a liquor license in effect. Owner and Tenant will maintain their respective liquor licenses as valid licenses in good standing during the Term hereof.

2.    USE AND OCCUPANCY.

A.    Quiet Enjoyment.  Manager shall have exclusive possession of the Premises for the purpose of managing and operating the Restaurant as provided in this Agreement during the terms hereof.  In addition, Tenant consents to the use by Manager of the Plaza for the purpose of offering and providing restaurant or other food and beverage services to Restaurant customers or other persons using the Plaza, subject, however, to the terms and conditions of this Agreement. It shall be the sole responsibility, however, of Manager to obtain, comply with and maintain any required or government or other permits or approvals for such use other than any liquor license, which shall be Tenant's sole responsibility as provided in Section 1.G hereof.  Subject to the rights of Tenant to inspection, repair and other express provisions of this Agreement, so long as Manager is not in material default of this Agreement which continues after any applicable notice and cure periods provided herein with respect to such default, Tenant will not disturb Manager's operation of the Restaurant.

B.    Permitted Uses.    Manager shall use, operate and manage the Restaurant as a first-class restaurant and bar ("Permitted Use"), and shall not use, operate or manage the Restaurant for any other purpose.  Manager shall at all times conduct its business in a first-class and reputable manner, consistent with the reasonable standards of the Hotel regarding the Restaurant's appearance (as such standards are communicated by Tenant from time to time), and shall keep all portions of the Restaurant which are used by patrons or customers or which are visible from the street or the lobby of the Building (including, without limitation, the storefront and all signs and displays) in a neat and clean condition.

C.    Use Prohibitions.    Anything contained herein to the contrary notwithstanding, Manager shall not use the Restaurant or any part thereof, or knowingly permit the Restaurant or any part thereof to be used, (i) for the possession, storage, manufacture or sale of drugs or narcotics, or (ii) as a night club or discotheque and in furtherance thereof, Manager acknowledges and agrees that it shall not be permitted to make any application for a night club or cabaret license for the Restaurant.

D.    Operation of Business.    (i)    Manager agrees to keep the Restaurant open and operated continuously for business at least during the hours of 7:00 a.m. to 11:00 p.m., each day of the week ("Operating Hours").  Manager shall at all times during Operating Hours offer a complete breakfast, lunch and dinner menu and employ an adequate number of employees, for the diligent and active conduct of business in the Restaurant.  If Manager shall fail to operate during the Operating Hours, such failure shall constitute a default hereunder, unless the Premises are closed for repairs, re-decoration or other improvement as provided in this Agreement, closed due to other events as provided for in this Agreement or closed due to force majeure.

(ii)    Manager shall provide adequate window display lighting during Operating Hours.  All such lighting shall comply with all Legal Requirements and with the Rules and Regulations.

(iii)    In addition to any other restrictions set forth in this Agreement, Manager shall not (a) use the lobby or any other common areas of the Building for display or any

other purpose except as approved by Tenant, (b) store any trash or garbage in any area other than inside the Restaurant or at other locations approved by Tenant (and Manager shall comply with the provisions of Subsection E of Article 29), (c) use the sidewalk in front of the Restaurant or Hotel for the placement or display of any signs, placard, merchandise, promotions, or for any other use, (d) use loudspeakers or vending machines (other than in washrooms) or video games in or about the Restaurant, (e) allow excessive noise, obnoxious odors, or annoying lighting in the Restaurant at any time, (f) permit excessive music or any other sounds in the Restaurant to be heard outside of the Restaurant, (g) permit excessive odors or fumes beyond the Restaurant (and if such odors or fumes emanate from the Restaurant, Manager shall within ten (10) days' notice from Tenant install or commence to install, at its own cost and expense, reasonable control devices or procedures to eliminate such odors, and complete such installation as expeditiously as possible), (g) permit live entertainment of any type, (h) except on holidays, New Years' eve, or for catered affairs, permit dancing, or (i) suffer, permit or commit any waste or any nuisance or other act or thing in the Restaurant which may disturb any Hotel guest or occupant in the Building. Manager shall restrict the use of the lavatory, toilet and plumbing facilities of the Restaurant to Manager's employees, Hotel guests and customers and shall not allow use thereof by the general public. Manager shall receive deliveries and services and arrange for refuse disposal only through the rear service entry to the Restaurant, if any, or as otherwise directed by Tenant. The provisions of this subparagraph (iii) of this Subsection C are a material inducement for Tenant to execute and deliver this Agreement. Any failure by Manager to comply with the provisions hereof shall be deemed a material breach of this Agreement for which Tenant shall be entitled to any and all of its remedies in accordance with the terms, covenants and conditions of this Agreement.

(iv)    Manager shall not use or permit the use of the name "Dumont" or "Dumont Plaza" or any derivative thereof, in any form or fashion in the conduct of its business, unless Owner and Tenant have given their prior written consent thereto, which consent shall be in Owner's and Tenant's sole discretion.

(v)    (1)    Manager shall provide room service to guests of the Hotel, which room service shall be available during the Operating Hours. Room service of alcoholic beverages shall be made only from the Owner's private stock of alcoholic beverages maintained ... Owner on the Hotel premises which Manager shall have access to for purposes of effecting room service delivery), and shall not be made out of the Restaurant's stock of alcoholic beverages from the Premises. Deliveries shall be made by Manager's personnel, who shall be permitted to use the Building's elevators for such deliveries in accordance with the applicable provisions of this Agreement and subject to the Hotel's reasonable rules and regulations. All such employees providing room service (and all other employees of Manager who provide any services in the Hotel) shall dress appropriately and shall conduct themselves in a manner consistent with the standards of operation of the Hotel. All trays used in connection with providing such room service shall be picked up by Manager in a timely manner.

(2)    Guests of the Hotel shall be permitted to charge room service and restaurant charges to their Hotel room bills. All restaurant and room service charges billed by Hotel guests to their Hotel bills shall be delivered by Manager to Tenant on a daily basis (or more frequently, if necessary) for posting to each guest's bill, and such charges shall be collected

by Tenant. Tenant shall be responsible for collecting such charges from the Owner and remitting payment thereof to Manager as provided hereunder. Upon Tenant's request, Manager shall employ any computerized billing or bill entry software or system designated by Owner for prompt listing and billing of Restaurant charges to Hotel guests. The costs of installing any such system shall be borne by Tenant or Owner, but it shall be Manager's responsibility to train its employees in the proper use thereof. Tenant shall submit to Manager bi-monthly, by the fifteenth (15th) and thirtieth (30th) day of the month (or closest business day thereto), a written statement showing the restaurant and room service charges that Hotel guests charged to their rooms during the immediately preceding bi-monthly period, together with a check in an amount equal to the aggregate amount of such charges. Any room service charges for which payment was made by Tenant but which were credited or refunded to a guest's account shall be deducted from future payments to Manager hereunder. Tenant shall have the right to reduce or eliminate any room service charges if a guest disputes a room service charge (or any portion thereof), provided that Tenant shall make arrangements with Owner for Owner to use its good faith efforts to minimize such reductions or eliminations of disputed charges, to do so only when reasonable and to insure that Owner shall not reduce or eliminate room service charges for purposes other than to address disputes by guests concerning such charges, and Tenant shall keep Manager informed thereof. For purposes of this section 2, room service charges by the Manager shall be solely for food services, as all alcoholic beverages will be delivered and provided by the Manager out of the Owner's stock from the Hotel premises, and Owner charges to Hotel guests for room service of alcoholic beverages shall be for the account of Owner only.

E.      Owner and Tenant agree that, during the term of this Agreement, the Restaurant shall be the exclusive on-site restaurant in the Hotel, and that Manager shall be the preferred, but non-exclusive food and beverage service and catering service for Hotel guests or other persons using the Hotel premises.

3.      **ALTERATIONS.**

A.      <u>Defined Terms.</u>      The following terms shall have the meanings hereinafter set forth used throughout this Agreement, Exhibits, Schedules and Riders (if any).

(i)      "Alterations" shall mean and include all installations, changes, alterations, restorations, renovations, decorations, replacements, additions, improvements and betterments made in or to the Restaurant or the Building, and shall include Manager's Initial Work, but excluding Decorative Alterations.

(ii)      "Building Systems" shall mean the mechanical, gas, electrical, sanitary, heating, air-conditioning, ventilating, elevator, plumbing, life-safety and other service systems of the Building.

(iii)      "Decorative Alterations" shall mean Alterations which do not require the issuance of a building permit or any other governmental authorization and which are purely decorative in nature (i.e., painting, the installation or removal of carpeting or wall coverings).

197178-11w                                7

(iv)    "Legal Requirements" shall mean and include all laws orders, ordinances, directions, notices, rules and regulations of the federal government and of any state, county, city, borough and municipality, and of any division, agency, subdivision, bureau, office, commission, board, authority and department thereof, and of any public officer or official and of any quasi-governmental officials and authorities, and of any insurance boards, having jurisdiction over the land on which the Building is located (the "Land"), the Building and/or the Restaurant.

(v)    "Non-Structural Alterations" shall mean non-structural, non-mechanical and non-electrical Alterations.

(vi)    "Permits" shall mean all governmental permits, approvals, licenses, authorizations, waivers, consents and certificates which may be required in connection with the performance of any Alterations.

(vii)    "Manager's Initial Work" shall mean the Alterations to be performed by Manager at the commencement of the Term, the artist's rendering or other drawings and specifications for which, along with the illustrations or specifications for Manager's exterior signage attached hereto as **Exhibit B**.

B.    Alterations Within Restaurant.    (i)    Except as expressly provided to the contrary herein, Manager shall make no Alterations in or to the Restaurant, including removal of partitions, doors, electrical installations, plumbing installations, kitchen or restaurant trade fixtures such as ovens, grills, walk-in refrigerators or freezers, water coolers, heating, ventilating and air conditioning or cooling systems, units or parts thereof or other apparatus of like or other nature, whether structural or non-structural, without Tenant's prior written consent, which consent Tenant agrees not to unreasonably withhold or unduly delay with respect to Alterations that are made entirely within the Restaurant and which do not (i) affect the structure of the Building or any Building Systems outside (or serving parts of the Building outside) the Restaurant, or (ii) violate, create a condition which violates, or require Tenant or Owner to perform any work or incur any expense to ensure compliance with, any Legal Requirements (it being agreed that, in all other instances, Tenant may withhold its consent in Tenant's sole but reasonable discretion); and then only by contractors or mechanics approved in writing by Tenant (which approval Tenant agrees not to unreasonably withhold or unduly delay). Notwithstanding anything to the contrary contained in this Subsection B. Manager shall have the right, on not less than ten (10) days' prior written notice to Tenant, but without being required to obtain Tenant's consent, to perform Decorative Alterations in or to the Restaurant, provided that: (y) Manager shall comply with all applicable Legal Requirements and all of the other applicable requirements governing Alterations set forth in this Agreement, and (z) such Decorative Alterations shall be performed only by contractors or mechanics approved in writing by Tenant (which approval Tenant agrees not to unreasonably withhold or unduly delay with respect to contractors or mechanics performing such Decorative Alterations). Tenant expressly reserves the right to exclude from the Building any person, firm or corporation attempting to perform any Alterations or act as construction contractor or Tenant without Tenant's prior written consent, which consent shall not be unreasonably withheld or delayed, except with respect to contractors performing structural, mechanical or electrical work, with respect to which Tenant may arbitrarily withhold its consent.

197178-11w                                                     8

(ii)    It shall be Manager's responsibility and obligation to ensure that all Alterations: (1) shall be made at Manager's own cost and expense and at such times and in such manner as Tenant may from time to time designate (including reasonable rules governing Alterations as Tenant may from time to time make), (2) shall comply with all Legal Requirements (including New York City Local Laws No. 5 of 1973, No. 16 of 1984 and No. 58 of 1988, each as amended from time to time, and all Legal Requirements then in effect relating to access for the handicapped or disabled), (3) shall be made promptly and in a good and workmanlike manner using materials substantially similar in quality to the standard generally used in the Building or higher quality materials, and (4) shall not affect the appearance of the Building outside of the Restaurant or be visible from the exterior of the Building, it being Owner's intention to keep the exterior appearance of the Building reasonably uniform (and, in pursuance thereof, Tenant shall have the right to approve the appearance of all such Alterations, including ceiling heights, blinds, lighting, signs and other decorations which are visible from the exterior of the Building or the Restaurant, which approval shall not be unreasonably withheld, provided that the exterior appearance of such Alterations shall comply with all Legal Requirements and be consistent with Owner's intention to maintain a uniform exterior appearance of the Building). Tenant shall be deemed to have approved the exterior appearance of Manager's Alterations upon Tenant's approval of Manager's plans and specifications if accompanied by artist's rendering in reasonable detail showing the final appearance of the completed Alterations.

C.    Tenant's Right to Inspect.    Tenant shall have the right to inspect the performance of the Alterations at any time to verify compliance by Manager with the provisions of this Agreement.

D.    Required Submissions; Permits.    (i)    Prior to commencing the performance of any Alterations (other than Decorative Alterations but including Manager's Initial Work), Manager shall furnish to Tenant:

(1)    Plans and specifications prepared by a licensed architect or engineer engaged by Manager, at the sole cost and expense of Manager, in sufficient detail to be accepted for filing by the New York City Building Department (or any successor or other governmental agency serving a similar function) if such filing is required or, if not required, in sufficient detail to accurately reflect the proposed Alterations (the "Plans and Specifications"), and in accordance with the requirements set forth on Exhibit C annexed hereto and made a part hereof. Manager shall not commence the performance thereof unless and until Tenant has given written consent to the Plans and Specifications (which consent, subject to the provisions of Subparagraph B(i) above, shall not be unreasonably withheld or delayed with respect to Plans and Specifications for Non-Structural Alterations). Tenant's approval of the Plans and Specifications shall be evidenced by written endorsement by an authorized representative of Tenant to that effect on two (2) sets of the Plans and Specifications, one (1) set to be retained by Tenant and the other to be returned to Manager. Tenant shall communicate its approval or disapproval of submitted Plans and Specifications to Manager within 15 days of their receipt by Tenant, and such Plans and Specifications shall be deemed approved unless Tenant disapproves of the within such 15 day period. Any disapproval of Manager's Plans and Specifications shall

be set forth in writing setting forth Tenant's objections in reasonable detail. If Tenant shall disapprove the Plans and Specifications, then Manager shall in good faith promptly proceed to amend the Plans and Specifications to satisfy Tenant's objections and shall resubmit such amended Plans and Specifications to Tenant for approval;

(2)    A certificate evidencing that Manager (or Manager's contractors) has (have) procured and paid for worker's compensation insurance covering all persons employed in connection with the work, who might assert claims for death or bodily injury against Owner, Tenant, Manager, the Land and/or the Building as set forth in **Exhibit D**, and such additional personal injury and property damage insurance (over and above the insurance required to be carried by Manager pursuant to the provisions of Article 9), builder's risk, fire and other casualty insurance as Tenant may reasonably require (based on Owner's insurance requirements) in connection with the Alterations;

(3)    If the work to be undertaken is of such a nature that it requires the approval of any Mortgagee (as defined in Article 7) or Lessor (as defined in Article 7), such approval shall be obtained at Manager's cost and expense and Tenant hereby agrees, at Manager's request but at no cost or expense to Tenant, to use reasonable efforts to cooperate with Manager with respect to Manager's obtaining such approval, including but not limited to seeking the cooperation of Owner thereto; if the work (including Manager's Initial Work) requires expenditures by Manager in excess of $200,000 (exclusive of the cost of Decorative Alterations and equipment), a surety company performance bond in form and substance satisfactory to Tenant (procured at Manager's cost and expense), issued by a surety company reasonably acceptable to Tenant, or other security reasonably satisfactory to Tenant, in an amount equal to at least 125% of the estimated cost of such Alterations, guaranteeing to Owner, Tenant and any Mortgagee and/or Lessor the completion thereof and payment therefor within a reasonable time, free and clear of all liens, encumbrances, chattel mortgages, security interests, conditional bills of sale and other charges, and in accordance with the plans and specifications approved by Tenant, and such other security as may be satisfactory to Tenant in its sole judgment;

(4)    Such permits, authorizations or consents as may be required by any applicable Legal Requirements, all of which shall be obtained at Manager's cost and expense, provided, however, that no plans, specifications or applications shall be filed by Manager with any governmental authority without Manager first obtaining Tenant's written consent thereto; and

(5)    A written letter of authorization, in form reasonably satisfactory to Tenant, signed by all architects, engineers, surveyors and designers to become involved in such Alterations, which shall confirm that, if Manager shall abandon performance of any such Alterations, any of their respective drawings or plans are to be removed from any filing with governmental authorities on the request of Tenant.

(ii)    Owner's or Tenant's engineer, at Manager's expense, will design, in accordance with the Plans and Specifications, all engineering work required (if any) for electric, sprinklers and ventilation. In the event Manager shall require engineering services for any

structural work (which work has been previously approved by Tenant) or as a result of changes in the Plans and Specifications, layout or Manager's requirements for occupancy, or for any other purposes which require additional engineering services, such engineering services shall be performed by Owner's or Tenant's engineer only, and Manager shall reimburse Tenant within ten (10) days of receipt of a statement for the reasonable cost of such engineering services.

(iii)    Upon Tenant's approval of the Plans and Specifications, Manager shall cause the Plans and Specifications (including mechanical plans and specifications) to be filed with the governmental agencies having jurisdiction thereof, in order to obtain, and shall obtain all Permits which may be required in connection with the performance of such Alterations. All of the Plans and Specifications shall be filed, and all Permits which are required shall be obtained, by Tenant's expediter, at Manager's sole cost and expense. Tenant shall cause Owner, with reasonable promptness, to sign the applications for such Permits prepared by Manager which require Tenant's signature and Manager shall indemnify and hold Tenant and Owner harmless against any claim, cost, liability or expense resulting from any error, omission or other impropriety or deficiency in any such application.

E.    Completion of Alterations.   Manager, at Manager's sole cost and expense, shall complete all Alterations in accordance with the provisions of this Article 3 and this Agreement. Alterations shall be deemed completed at such time as (a) all certifications, approvals, licenses and permits with respect to such Alterations that may be required to evidence compliance with all Legal Requirements have been obtained and delivered to Tenant, and (b) Manager shall (i) furnish evidence reasonably satisfactory to Tenant and Owner that all Alterations have been completed and paid for in full and that any and all liens therefor that have been or might be filed have been discharged of record or waived and that no security interests relating thereto are outstanding, (ii) pay Owner and Tenant for the cost of any work performed by Owner or Tenant on Manager's behalf in connection with such Alterations, (iii) except as to Decorative Alterations, furnish Tenant with one (1) set of sepia mylar transparent reproducible "as built" drawings of the Restaurant together with four (4) full size sets of prints of the same, and the same in CADD format (which Tenant may transfer to Owner if Owner so requests), and (iv) except as to Decorative Alterations, furnish an affidavit in the form recommended by the American Institute of Architects from Manager's registered architect certifying that the Alterations have been performed in accordance with the Plans and Specifications as approved by Tenant. Manager shall indemnify and save harmless both Owner and Tenant and their respective agents from and against any and all claims, actions, liabilities and obligations arising from any work in connection with, or other matters related to, the Alterations.

F.    Liens.  (i)    In no event shall any material or equipment be incorporated in or affixed to the Restaurant in connection with any Alterations which is subject to any lien, encumbrances, chattel mortgage, security interest, charge of any kind whatsoever, or is subject to any conditional sale or other similar or dissimilar title retention agreement, except for equipment purchased or acquired for use in the Restaurant, which may be subject to a purchase money or other financing security interest or lien.

(ii)    Manager shall not create or permit to be created any lien, encumbrance or charge (levied on account of any taxes or any mechanic's, laborer's or

197178-11w                                          11

materialman's lien, conditional sale, title retention agreement or otherwise) which might be or become a lien, encumbrance or charge upon the Land or Building or any part thereof or the income therefrom, and Manager shall not suffer any other matter or thing whereby the estate, rights and interest of Owner in the Land or Building or any part thereof might be impaired. Manager shall take all steps necessary under local laws to prevent the imposition of such a lien, encumbrance or charge on the Land or Building.

(iii)    If any lien, encumbrance or charge referred to in this Subsection F shall any time be filed against the Land or Building or any part thereof, then Manager, within twenty (20) days after Manager shall have received notice of the filing thereof and at Manager's cost and expense, shall cause the same to be discharged of record by bonding or otherwise, and Manager shall indemnify Owner and Tenant against and defend and hold Owner and Tenant harmless from all costs, expenses, liabilities, losses, fines and penalties, including reasonable attorneys' fees and disbursements, resulting therefrom. If Manager shall fail to cause such lien to be discharged within the aforesaid period, then, in addition to any other right or remedy, Tenant may discharge the same either by paying the amount claimed to be due or by procuring the discharge of such lien by deposit or by bonding proceedings, and in any such event Tenant shall be entitled, if Tenant so elects, to compel the prosecution of an action for the foreclosure of such lien by the lienor and to pay the amount of the judgment in favor of the lienor with interest, costs and allowances. Any amount so paid by Tenant and all costs and expenses incurred by Tenant in connection therewith, together with interest thereon at the Interest Rate (as defined in Article 19), shall constitute Additional Charges payable by Manager under this Agreement, which Additional Charges shall be paid by Manager to Tenant on demand within five (5) days following delivery of a bill therefor to Manager.

G.    Miscellaneous Conditions.    (i)    Manager shall not at any time, either directly or indirectly, use any contractors or labor or materials in the Restaurant if the use of such contractors or labor or materials would create any work stoppage, picketing, labor disruption or any other difficulty with other contractors or labor engaged by Manager, Tenant, Owner or others in the construction, maintenance or operation of the Building or any part thereof. Manager shall immediately stop any work or other activity if Tenant shall notify Manager that continuing such work or activity would violate the provisions of the immediately preceding sentence.

(ii)    Neither Owner nor Tenant shall be liable for any failure or diminution of any Building Systems or services, or for any damage to Manager's property or the property of any other person, caused by Alterations made by Manager, notwithstanding Tenant's consent thereto or to the plans and specifications therefor. Manager shall promptly correct any faulty or improper Alteration made by Manager and shall repair any and all damage caused thereby at its sole cost and expense. Upon Manager's failure to promptly make such corrections and repairs, Tenant may make such corrections and repairs and charge Manager for the cost thereof and any such charge shall be deemed Additional Charges, and shall be paid by Manager to Tenant upon demand. The review and/or approval by Tenant, its agents, consultants and/or contractors, of any Alterations or of plans and specifications therefor and the coordination of the performance of such Alterations with the Building, are solely for the benefit of Tenant, and neither Tenant nor any of its agents, consultants or contractors shall have any duty toward Manager; nor shall

197178-11w                                      12

Tenant or any of its agents, consultants and/or contractors be deemed to have made any representation or warranty to Manager, or have any liability, with respect to the safety, adequacy, correctness, efficiency or compliance with Legal Requirements of any plans and specifications, Alterations or any other matter relating thereto.

(iii)    All Alterations to be performed by Manager shall be performed under the supervision of an independent licensed architect approved by Tenant, which approval shall not be unreasonably withheld or delayed, and shall be done in a manner which will not interfere with or disturb Hotel guests or other occupants of the Building nor delay or impose any additional expense on Owner or Tenant in the maintenance, cleaning, repair, safety, management and security of the Building or the Building Systems or in the performance of any improvements in the Building.

(iv)    Manager shall, and shall cause its contractors and suppliers to, comply with Tenant's and/or Owner's rules and regulations attached hereto and with Tenant's directions for the coordination and control of construction activities in the Building and the protection and security of the Building and its systems and occupants.

(v)    If Manager shall fail to comply with any provision of this Article 3 (beyond notice and the expiration of any applicable cure period), Tenant, in addition to any other remedy herein provided, may require Manager to immediately cease all work being performed in the Building by or on behalf of Manager, and Tenant may deny access to the Restaurant to any person performing work or supplying materials in the Restaurant.

(vi)    Except as expressly provided to the contrary herein, the provisions of this Article 3 shall apply to the Manager's Initial Work, as well as to all future Alterations.

H.    Removal of Alterations.    (i)    All movable property, furniture, furnishings and trade fixtures furnished by or at the expense of Manager, other than those affixed to the Restaurant so that they cannot be removed without damage and other than those replacing an item theretofore furnished and paid for by Tenant or for which Manager has received a credit or allowance hereunder (if any), shall remain the property of Manager, and may be removed by Manager, including all paneling, decorations, partitions, ceilings, mezzanine floors, galleries and the like, which are affixed to the Restaurant, shall become the property of Tenant and may not be removed by Manager.

(ii)    In any case where Manager removes any property or Alterations in accordance with Subsection H(i) or otherwise, Manager shall immediately repair all damage caused by said removal and shall restore the Restaurant to good order and condition at Manager's expense, and if Manager fails to do so, Tenant may do so at Manager's cost and Manager shall reimburse Tenant therefor upon demand. Upon failure of Manager to remove any such property or Alterations, Tenant may, at Manager's expense: (1) remove all such property and Alterations which Tenant may require Manager to remove pursuant to Subsection H(i), (2) cause the same to be placed in storage, and (3) repair any damage caused by said removal and

restore the Restaurant to good order and condition. Manager shall reimburse Tenant for all of the aforesaid expenses upon demand.

(iii)    Notwithstanding anything to the contrary contained in this Subsection H, any items of property or Alterations not removed by Manager may, at the election of Tenant, be deemed to have been abandoned by Manager, and Tenant may retain and dispose of said items without any liability to Manager and without accounting to Manager for the proceeds thereof.

(iv)    The provisions of this Subsection H shall survive the expiration or sooner termination of the Term, whereupon any and all monetary obligations of Manager pursuant thereto shall be deemed damages recoverable by Tenant.

I.    Manager's Initial Work.    Manager, in compliance with the further provisions of this Article 3, Building regulations and procedures, and other applicable provisions of this Agreement, shall perform the Manager's Initial Work. In addition, Manager shall make any and all modifications and additions and replacements to the existing sprinkler and alarm systems within or serving the Restaurant as may be necessitated by the Manager's Initial Work. Manager shall not construct or expand any mezzanines. Manager will use commercially reasonable efforts efforts to complete the Initial Work and open the Restaurant for business to Hotel guests and the general public within five (5) months from the date of this Agreement. If Manager fails to complete the Initial Work and open the Restaurant to the public by the end of seven (7) months from the Commencement Date, then, unless such failure of Tenant to materially comply with the terms and conditions of this Agreement, Tenant may terminate this Agreement by delivery of written notice thereof at any time thereafter to Manager. If Tenant has not exercised this right of termination prior to the date that Manager has completed the Initial Work and has opened the Restaurant to the public, this termination right of Tenant shall terminate.

4.    REPAIRS - FLOOR LOAD.

A.    Manager's Repairs. If Tenant allows Manager to erect on the outside of the Building a sign or signs for the exclusive use of Manager, Manager shall maintain such signs in good appearance and shall make all repairs thereto necessary to keep the same in good order and condition, at Manager's sole cost and expense, and shall cause the same to be covered by Manager's liability insurance provided for in Article 9. Manager shall, throughout the Term, take good care of the Restaurant and the fixtures and appurtenances therein, and at Manager's sole cost and expense, make all non-structural repairs thereto as and when needed to preserve them in good working order and condition, reasonable wear and tear and damage for which Manager is not responsible under the terms of this Agreement excepted. Notwithstanding the foregoing, all damage or injury to the Restaurant or to any other part of the Building, or to its fixtures, equipment and appurtenances, whether requiring structural or nonstructural repairs, caused by or resulting from carelessness, omission, neglect or improper conduct of or Alterations made by Manager or any of Manager's servants, employees, invitees or licensees, shall be repaired promptly by Manager, at its sole cost and expense, to the satisfaction of Tenant. Manager also shall repair all damage to the Building and the Restaurant caused by the moving of Manager's fixtures, furniture or equipment. All the aforesaid repairs shall be of quality and class equal to the original work or construction and shall be made in accordance with the provisions of

197178-11w                          14

Article 3 hereof.  If Manager fails after ten (10) days' notice to proceed with due diligence to make repairs required to be made by Manager hereunder, the same may be made by Tenant, at the expense of Manager, and the expenses thereof incurred by Tenant shall be collectible by Tenant as Additional Charges promptly after rendition of a bill or statement therefor.  Manager shall give Tenant prompt notice of any defective condition in any plumbing, electrical, air cooling or heating system located in, servicing or passing through the Restaurant.  Manager shall not place a load upon any floor of the Restaurant exceeding the floor load per square foot area which such floor was designed to carry and which is allowed by law.  Tenant reserves the right to prescribe the weight and position of all safes, business machines and heavy equipment and installations.  Business machines and mechanical equipment shall be placed and maintained by Manager at Manager's expense in settings sufficient in Tenant's reasonable judgment to absorb and prevent vibration, noise and annoyance.  Except as expressly provided in Article 10 hereof, there shall be no allowance to Manager for a diminution of business of the Restaurant or value thereof and no liability on the part of Owner or Tenant by reason of inconvenience, annoyance or injury to business arising from Owner, Tenant, Manager or others making, or failing to make, any repairs, alterations, additions or improvements in or to any portion of the Building, including the erection or operation of any crane, derrick or sidewalk shed, or in or to the Restaurant, or in or to fixtures, appurtenances, or equipment thereof.  If the Restaurant be or become infested with vermin, Manager, at Manager's expense, shall cause the same to be exterminated from time to time to the satisfaction of Tenant and shall employ such exterminators and such exterminating company or companies as shall be reasonably approved by Tenant.  The water and wash closets and other plumbing fixtures shall not be used for any purposes other than those for which they were designed or constructed, and no sweepings, rubbish, rags, acids or other substances shall be deposited therein.

B.   <u>Tenant's Repairs</u>.  Unless and except to the extent damaged due to the misuse, negligence or malfeasance of Manager, Tenant shall promptly maintain and repair, or cause Owner to promptly maintain and/or repair, and to keep the same in good order and condition, at it or Owner's sole cost and expense, the common areas of the Building, the exterior of the Building (other than the Restaurant store front, which shall be Manager's responsibility), the foundation, external and supporting walls and ceiling of the Premises (other than the interior surfaces of the same), the Building heating system, plumbing, gas, electrical lines, air cooling or heating system and ducts and ventilation system and ducts within the Building up to the Premises (other than any Building System components exclusively serving the Premises. and any gas. electric lines or service or ventilation. duct work installed by Manager for service to the Restaurant. which shall be maintained and repaired by Manager). and the sidewalks in front of the Hotel and Restaurant.

5.   <u>WINDOW CLEANING</u>.   Manager shall not clean, nor require, permit, suffer or allow any window in the Restaurant to be cleaned, from the outside in violation of Section 202 of the Labor Law, or any other applicable law, or of the rules of the Board of Standards and Appeals, or of any other board or body having or asserting jurisdiction.

6.   <u>REQUIREMENTS OF LAW</u>.   Manager, at its sole expense, shall comply with all Legal Requirements that shall now or hereafter impose any violation, order or duty upon Owner, Tenant or Manager with respect to the Restaurant, as a result of the use, operation, occupation or

197178-11w                        15

alteration thereof by Manager. Manager shall not do or permit to be done any act or thing upon the Restaurant which will invalidate or be in conflict with any insurance policies covering the Building and fixtures and property therein; and shall not do, or permit anything to be done in or upon the Restaurant, or bring or keep anything therein, except as now or hereafter permitted by the New York City Fire Department, New York Board of Fire Underwriters, New York Fire Insurance Rating Organization or other authority having jurisdiction and then only in such quantity and manner of storage as not to increase the rate for fire insurance applicable to the Building, or use the Restaurant in a manner which shall increase the rate of fire insurance on the Building or on property located therein, over that in similar type buildings or in effect prior to this Agreement. Any work or installations made or performed by or on behalf of Manager or any person claiming through or under Manager pursuant to this Article shall be made in conformity with, and subject to the provisions of, Article 3 hereof. If by reason of Manager's failure to comply with the provisions of this Article, the fire insurance rate shall at the beginning of this Agreement or at any time thereafter be higher than it otherwise would be, then Manager shall reimburse Tenant, as Additional Charges hereunder, for that part of all fire insurance premiums thereafter paid by Tenant which shall have been charged because of such failure of use by Manager, and shall make such reimbursement upon the first day of the month following such outlay by Tenant. In any action or proceeding wherein Tenant and Manager are parties, a schedule or "make up" of rates for the Building or the Restaurant issued by the New York Fire Insurance Rating Organization, or other body fixing such fire insurance rates, shall be conclusive evidence of the facts therein stated and of the several items and charges in the fire insurance rates then applicable to the Restaurant. Notwithstanding the foregoing, Manager shall have no liability for make-up of rates not attributable to Manager's failure to comply with its covenants in this Article 6, alteration or repairs to structural components of the Building or Premises unless and except to the extent required or due to the manner of Manager's use or activities at the Premises.

7.    SUBORDINATION.

A.    Subordination. This Agreement is subject and subordinate to each and every ground or underlying lease of the Land or the Building heretofore or hereafter made by Owner (but not Tenant) (collectively the "Superior Leases") and to each and every trust indenture and mortgage affecting the "Mortgage") which may now or hereafter affect the Land, the Building or any such Superior Lease and the leasehold interest created thereby, and to all renewals, extensions, supplements, amendments, modifications, consolidations, and replacements thereof or thereto, substitutions therefor and advances made thereunder. This clause shall be self-operative and no further instrument of subordination shall be required to make the interest of any lessor under a Superior Lease (a "Lessor"), or trustee or mortgagee of a Mortgage (a "Mortgagee") superior to the interest of Manager hereunder. In confirmation of such subordination, however, Manager shall execute promptly any certificate that Tenant may request and Manager hereby irrevocably constitutes and appoints Tenant as Manager's attorney-in-fact to execute any such certificate or certificates for and on behalf of Manager. If the date of expiration of any Superior Lease shall be the same day as the Expiration Date, the Term shall end and expire twelve (12) hours prior to the expiration of the Superior Lease. Manager covenants and agrees that, except as expressly provided herein, Manager shall not do anything that would constitute a default under any Superior Lease or Mortgage, or omit to do anything

that Manager is obligated to do under the terms of this Agreement so as to cause Owner or Tenant to be in default under any of the foregoing. If, in connection with the financing of the Land, the Building or the interest of the lessee under any Superior Lease, any lending institution shall request reasonable modifications of this Agreement that do not materially increase the obligations or materially and adversely affect the rights of Manager under this Agreement, Manager covenants to make such modifications.

B.    **Attornment.**    If at any time prior to the expiration of the Term, any Mortgage shall be foreclosed or any Superior Lease shall terminate or be terminated for any reason, Manager agrees, at the election and upon demand of any owner of the Land or the Building, or the lessor under any such Superior Lease, or of any mortgagee in possession of the Land or the Building, to attorn, from time to time, to any such owner, lessor or mortgagee, upon the then executory terms and conditions of this Agreement, for the remainder of the term originally demised in this Agreement, provided that such owner, lessor or mortgagee, as the case may be, or receiver caused to be appointed by any of the foregoing, shall not then be entitled to operation of the Restaurant or the benefits thereof except as provided in this Agreement. The provisions of this Subsection B shall inure to the benefit of any such owner, lessor or mortgagee, shall apply notwithstanding that, as a matter of law, this Agreement may terminate upon the termination of any such Superior Lease, and shall be self-operative upon any such demand, and no further instrument shall be required to give effect to said provisions. Manager, however, upon demand of any such owner, lessor or mortgagee, agrees to execute, from time to time, instruments in confirmation of the foregoing provisions of this Subsection B, satisfactory to any such owner, lessor or mortgagee, acknowledging such attornment. Nothing contained in this Subsection B shall be construed to impair any right otherwise exercisable by any such owner, lessor or mortgagee.

C.    **Continuation of Manager's Rights and Obligations Under Agreement.**    Owner agrees that, upon any termination of the Restaurant Lease prior to the termination of this Agreement, and notwithstanding any amendment of the Restaurant Lease prior to the termination of this Agreement, this Agreement shall continue in effect as an agreement between Owner and Manager, and Manager may continue to operate the Restaurant, in each case in accordance with and subject to the terms and conditions of this Agreement. If Tenant voluntarily surrenders its liquor license (other than for a replacement license on equal or better terms), Owner will use its best efforts to modify or extend Owner's license to enable Manager to continue operating the Restaurant with a liquor license for the Premises.

8.    **RULES AND REGULATIONS.**    Manager and Manager's servants, employees, agents, visitors, and licensees shall observe faithfully, and comply strictly with, the Rules and Regulations annexed hereto and made a part hereof as **Schedule A** and such other and further reasonable Rules and Regulations as Tenant or Tenant's agents may from time to time adopt (collectively, the "**Rules and Regulations**") on such notice to be given as Tenant may elect. In case Manager disputes the reasonableness of any additional Rule or Regulation hereafter made or adopted by Tenant or Tenant's agents, the parties hereto agree to submit the question of the reasonableness of such Rule or Regulation for decision to the Chairman of the Board of Directors of the Management Division of The Real Estate Board of New York, Inc., or to such impartial person or persons as he may designate, whose determination shall be final and

197178-11w                                          17

conclusive upon the parties hereto. The right to dispute the reasonableness of any additional Rule or Regulation upon Manager's part shall be deemed waived unless the same shall be asserted by service of a notice in writing upon Tenant within ten (10) days after receipt by Manager of written notice of the adoption of any such additional Rule or Regulation, accompanied by notice of such ten day time limit to protest the rule or regulation. Nothing in this Agreement shall be construed to impose upon Tenant any duty or obligation to enforce the Rules and Regulations or terms, covenants or conditions in any other lease, against any other Tenant or tenant of the Building and Tenant shall not be liable to Manager for violation of the same by any other Tenant or tenant, its servants, employees, agents, visitors or licensees.

9.    INSURANCE.

    A.    Manager's Insurance. Manager shall obtain, at Manager's sole expense, and will keep in full force and effect during the Term, a policy of commercial general liability, advertising injury, personal injury, products liability and liquor liability insurance including broad form contractual liability coverage under which Manager is named as the insured, and Owner and Tenant, and any mortgagee or other interested parties from time to time designated by Owner or Tenant, are named as an additional insureds, as their interests may appear. Such policy shall contain a breach of warranty endorsement or provision in favor of Tenant. Such policy shall also contain a provision that the insurance company will not cancel or refuse to renew the policy, without first giving Tenant at least fifteen (15) days (but Manager shall make reasonable efforts to obtain, both initially and upon renewal, thirty (30) days') written notice by certified mail, return receipt requested, which notice shall contain the policy number and the names of the insureds and policy holder. The minimum limits of liability shall be a combined single limit with respect to each occurrence in an amount of not less than $3,000,000 for injury (or death) and damage to property or such greater amount as Tenant may, from time to time, reasonably require. Manager may satisfy the foregoing requirement by a policy providing a combined single limit with respect to each occurrence in an amount of not less than $1,000,000 for injury (or death) and damage to property and an umbrella policy that provides at least $2,000,000 of such coverage. In addition, Manager shall be required to obtain, at Manager's sole expense, business interruption insurance sufficient to provide Manager with the ability to continue to pay the Tenant Fixed Fee for one (1) year, and Manager will keep such insurance in full force and effect during the Term. Manager shall provide to Tenant upon execution of this Agreement and at least thirty (30) days prior to the termination of any existing policy, a certificate evidencing the effectiveness of the insurance policies required to be maintained hereunder. Manager may obtain any of the insurance required hereunder pursuant to a blanket policy covering other properties, provided the insurance limits with respect to the Premises or Manager's liability as required by this Article are not diminished, each such policy shall in all respects comply with this Article and shall specify that the portion of the total coverage of such policy allocated to the Premises is in the amount required pursuant to this Article. The limits of the insurance required under this Article 9 shall not limit the liability of Manager under this Agreement. All insurance required to be carried by Manager pursuant to the terms of this Agreement shall be effected under valid and enforceable policies issued by reputable and independent insurers permitted to do business in the State of New York, and rated in Best's Insurance Guide, or any successor thereto (or if there be none, an organization having a national reputation) as having a general policyholder rating of "A-". In the event that Manager fails to

continuously maintain insurance as required by this Article 9, Tenant may, at its option and without relieving Manager of any obligation hereunder, order such insurance and pay for the same at the expense of Manager. In such event, Manager shall repay the amount expended by Tenant, with interest thereon, immediately upon Tenant's written demand therefor.

B.    Manager's Improvement Insurance.    Manager shall also maintain at its own expense during the Term a policy against fire and other casualty on Manager's construction within the Restaurant and Manager's property and improvements, including without limitation, all furniture, fixtures, personal property and inventory located in the Restaurant and owned by Manager on an "all-risk" form (excluding burglary) sufficient to provide 100% replacement value of such property, which policy shall otherwise comply with the provisions of Subsections A and D of this Article 9. Manager shall also maintain at its own expense during the Term a policy of workers' compensation insurance providing statutory benefits for Manager's employees and employer's liability.

C.    Tenant's Insurance.    Tenant shall obtain and will keep in full force and effect during the Term, a policy of property damage insurance covering the Premises (including Tenant's improvements, betterments, furniture and equipment (if any) in the Premises but excluding Manager's property and improvements, including without limitation, all of Manager's furniture, equipment, fixtures, personal property and inventory located in the Restaurant and owned by Manager, which is to be covered by Manager pursuant Article 9.B above) on an "all-risk" form sufficient to provide replacement value of such property, which policy shall otherwise comply with the provisions of Subsection D of this Article 9. The expense of obtaining and maintaining such insurance shall be an Additional Charge, payable by Manager hereunder within ten (10) days after receipt of notice from Tenant that the premium therefore is due. At Tenant's sole election, Tenant may arrange with Owner for the property damage insurance on the Premises to be obtained by and through Owner's policy, provided it otherwise provides the coverage required under this Subsection C, in which case Manager shall pay the portion of Owner's cost allocable to coverage of the Premises. Tenant shall provide to Manager within five days after execution of this Agreement and at least thirty (30) days prior to the termination of any existing policy, a certificate evidencing the effectiveness of the insurance policy required to be maintained hereunder. The insurance required to be carried by Tenant issued by a reputable and independent insurer permitted to do business in the State of New York, and listed in Best's Insurance Guide, or any successor thereto (or if there be none, an organization having a national reputation) as having a general policyholder rating of "A" and a financial rating of at least "8". In the event that Tenant fails to continuously maintain insurance as required by this Article 9, Manager may, at its option and without relieving Tenant of any obligation hereunder, order such insurance and pay for the same at the expense of Manager.

D.    Manager's Obligation to Pay Certain of Owner's or Tenant's Insurance Costs. Manager negotiated for the removal of Owner and Tenant requirements that (i) Manager's insurance contain a waiver of subrogation by Manager against Tenant and Owner or a consent to a waive of right of recovery against Tenant and Owner, (ii) an agreement by Manager's insurer that it will not make any claim against or seek to recover from Tenant or Owner for any loss, damage or claim whether or not covered under such policy with regard to manger's negligent

acts or omissions, and (iii) that Manager's policy contain a clause that the policy and the coverage evidenced thereby are primary with respect to any policies carried by Owner and tenant and that any coverage carried by Owner or Tenant shall be excess insurance. Owner and Tenant have agreed to remove such restrictions but subject to the obligation of Manager provided in this subparagraph D. If in any situation where the presence of any of the foregoing restrictions or agreements would have prevented or estopped Manager or Manager's insurance company from seeking co-insurance, recovery, partial recovery or contribution from Owner or Tenant of any of Owner's or Tenant's respective insurance carriers, Manager or Manager's insurance carrier seeks any such co-insurance, contribution or recovery or partial recovery, and in connection therewith or as a result of such claims history Owner and/or Tenant or any of Owner's affiliates suffer or incur increases in any of their insurance costs, then Manager shall pay to Owner or Tenant, as the case may be, all such increases for a period for three years (or longer period established by the insurance carrier with respect to such claims history), promptly following written demand therefor from Owner or Tenant, as the case may be, accompanied by reasonable written evidence of such increase (which may be a letter from the insurance carrier addressed to Owner or Tenant indicating the amount of the increase attributable to the relevant claim history.)

10.    DESTRUCTION OF THE RESTAURANT; PROPERTY LOSS OR DAMAGE.

A.    Repair of Damage.    Subject to the provisions of this Article 10, if the Restaurant shall be damaged by fire or other casualty, then, Tenant, at its sole cost and expense, shall repair or replace the ceiling slab and demising walls of the Restaurant, Tenant's equipment, improvements and betterments, including but not limited to the distribution portions of the Building Systems within the Restaurant (to the extent thereof as of the commencement of this Agreement (with any modifications or improvements thereto made by Manager after the date of this Agreement being the responsibility of Manager to repair or replace) or shall be caused by Tenant to be repaired by Owner at least to their condition immediately preceding the fire or other casualty, at Tenant's or Owner's sole cost and expense, all to the condition which existed on the date immediately preceding such fire or other casualty, promptly following notice thereof by Manager, unless the fire or other casualty is due to the negligence or malfeasance of Manager, in which case, notwithstanding anything in this Agreement to the contrary, it shall be Manager's sole and exclusive responsibility to repair. Neither Owner nor Tenant shall have any obligation to repair any damage to, or to replace any furniture, furnishings, equipment or other property or effects of Manager or any of Manager's Alterations or improvements (including any supplemental HVAC system, any exterior signage or any of Manager's property), or any wall or floor finishings or coverings installed by Manager or other items installed or owned by Manager not specifically set forth in the immediately preceding sentence. Manager's obligations to pay the Tenant Fixed Fee to Tenant shall abate during the period the Restaurant cannot be operated following any such fire or other casualty and during the period of repair of the Restaurant after any such fire or other casualty (unless such repairs do not prevent Manager from operating). Tenant, at its sole cost and expense, shall restore the Restaurant (excluding the portions thereof comprised of Manager's equipment, furniture, personal property as provided above in this Subsection A) and to substantially the condition that existed immediately prior to such casualty.

B.    Tenant's Termination Option. Anything in Subsection A of this Article 10 to the contrary notwithstanding, if the Building shall be so damaged by fire or other casualty that, in

197178-11w

20

Tenant's opinion, either substantial alteration, demolition or reconstruction of the Building shall be required (whether or not the Restaurant shall have been damaged or rendered untenantable) or the Building, after its repair, alteration or restoration shall not be economically viable as a hotel, then in any of such events, Tenant, at Tenant's option, may, not later than ninety (90) days following the damage, give Manager a notice in writing terminating this Agreement. If Tenant elects to terminate this Agreement, the Term shall expire upon the tenth (10th) day after such notice is given, and Manager shall vacate the Restaurant and surrender the same to Tenant. Upon the termination of this Agreement under the conditions provided for in the next preceding sentence, Manager's liability for Tenant Fixed Fees shall cease as of the day following such damage.

C.    Repair Delays. Tenant shall not be liable for reasonable delays which may arise by reason of adjustment of fire insurance on the part of Owner, Tenant and/or Manager, and for reasonable delays on account of labor troubles or any other cause beyond Owner's or Tenant's control.

D.    [Omitted.]

E.    Property Loss or Damage.   Any Building employee to whom any property shall be entrusted by or on behalf of Manager shall be deemed to be acting as Manager's agent with respect to such property and neither Owner, Tenant nor any of their respective agents shall be liable for any damage to property of Manager or of others entrusted to employees of the Building, nor for the loss of or damage to any property of Manager by theft or otherwise. Neither Owner, Tenant nor any of their respective agents shall be liable for any injury or damage to persons or property or interruption of the Restaurant business resulting from fire, explosion, falling plaster, steam, gas, electricity, water, rain or snow or leaks from any part of the Building or from the pipes, appliances or plumbing works or from the roof, street or subsurface or from any other place or by dampness or by any other cause of whatsoever nature; nor shall Owner, Tenant or any of their respective agents be liable for any such damage caused by Hotel guests or other tenants, occupants or persons in the Building or caused by construction of any private, public or quasi-public work; nor shall Owner nor Tenant be liable for any latent defect in the Restaurant or in the Building. Anything in this Article 10 to the contrary notwithstanding, nothing in this Agreement shall be construed to relieve Owner or Tenant from responsibility directly to Manager for any loss or damage caused directly to Manager wholly or in part by the gross negligence or willful misconduct of Owner or Tenant. respectively. If at any time any sidewalk bridge or scaffolding is installed or erected in front of the Restaurant for the purpose of making any repairs, alterations or additions to the Building, neither Owner nor Tenant shall be liable for any damage Manager may sustain thereby and Manager shall not be entitled to any compensation therefor nor abatement of its obligation to pay the Tenant Fixed Fee nor shall the same release Manager from its obligations hereunder nor constitute a breach hereof or an eviction; provided, however, that Owner or Tenant shall cause such bridge or scaffolding to be erected or placed in the same manner or with the same features as that erected or placed in front of the remainder of the front of the Hotel, to the extent reasonably feasible, and to be removed as quickly as reasonably practicable. Manager shall give immediate notice to Tenant in case of fire or accident in the Restaurant or in the Building. Manager shall not move any safe, heavy machinery, heavy equipment, freight, bulky matter or fixtures into or out of the Building without

197178-11w                                    21

Tenant's prior consent and payment to Tenant of Tenant's costs in connection therewith. If such safe, machinery, equipment, freight, bulky matter or fixtures requires special handling, Manager agrees to employ only persons holding a Master Rigger's License to do said work, and that all work in connection therewith shall comply with the Administrative Code of the City of New York and all other laws and regulations applicable thereto, and shall be done during such hours as Tenant may designate; provided, however, that such consent shall not be construed as a waiver of or diminish Manager's liability under this Agreement to indemnify Owner and Tenant for, and hold Owner and Tenant harmless and free from, damages sustained by persons or property and for any damages or monies paid out by Owner or Tenant in settlement of any claims or judgments, as well as for all expenses and attorneys' fees incurred in connection therewith and all costs incurred in repairing any damage to the Building or appurtenances as a result of Manager's acts or omissions.

11.    CONDEMNATION.

A.    Condemnation.    If the whole of the Land, the Building or the Restaurant shall be acquired or condemned for any public or quasi-public use or purpose, this Agreement and the Term shall end as of the date of the vesting of title with the same effect as if said date were the Expiration Date. If only a part of the Land or Building shall be so acquired or condemned then, (a) except as hereinafter provided in this Subsection, this Agreement and the Term shall continue in force and effect but, if a part of the Restaurant is included in the part of the Land or Building acquired or condemned, from and after the date of the vesting of title, the Tenant Fixed Fee shall be reduced in the proportion which the area of the part of the Restaurant so acquired or condemned bears to the total area of the Restaurant immediately prior to such acquisition or condemnation; (b) whether or not the Restaurant shall be affected thereby, Tenant, at Tenant's option, may give to Manager, within sixty (60) days next following the date upon which Tenant shall have received notice of vesting of title, a five (5) days' notice of termination of this Agreement; and (c) if the part of the Land or Building so acquired or condemned shall contain more than thirty (30%) percent of the total area of the Restaurant immediately prior to such acquisition or condemnation, or if, by reason of such acquisition or condemnation, Manager no longer has reasonable means of access to the Restaurant, Manager, at Manager's option, may give to Tenant, within sixty (60) days next following the date upon which Manager shall have received notice of vesting of title, a five (5) days' notice of termination of this Agreement. If any such five (5) days' notice of termination is given by Tenant or Manager this Agreement and the Term shall come to an end and expire upon the expiration of said five (5) days with the same effect as if the date of expiration of said five (5) days were the Expiration Date. If a part of the Restaurant shall be so acquired or condemned and this Agreement and the Term shall not be terminated pursuant to the foregoing provisions of this Subsection, Tenant, at Tenant's expense, shall restore that part of the Restaurant not so acquired or condemned to a self-contained unit. In the event of any termination of this Agreement and the Term pursuant to the provisions of this Subsection, the Tenant Fixed Fee shall be apportioned as of the date of sooner termination and any prepaid portion of Tenant Fixed Fee any period after such date shall be refunded by Tenant to Manager.

B.    Award. In the event of any such acquisition or condemnation of all or any part of the Land or Building, Owner shall be entitled to receive the entire award for any such acquisition

22

or condemnation, Manager shall have no claim against Owner or Tenant or the condemning authority for the value of any unexpired portion of the Term and Manager hereby expressly assigns to Owner all of its right in and to any such award. Nothing contained in this Subsection shall be deemed to prevent Manager from making a claim in any condemnation proceedings for the then value of any furniture, furnishings and fixtures installed by and at the sole expense of Manager and included in such taking, provided that such award shall not reduce the amount of the award otherwise payable to Owner.

12.   ASSIGNMENT.

A.   Prohibition Without Consent. Manager, for itself, its distributees, administrators, legal representatives, successors and assigns, expressly covenants that it shall not assign, pledge, encumber or otherwise transfer this Agreement nor delegate any of its obligations hereunder, nor suffer or permit the Restaurant or any part thereof to be used or occupied by others except by Hotel guests or customers in the ordinary course of business, without the prior written consent of Tenant in each instance which consent may be withheld or granted in its sole and absolute discretion except in the case of a sale of the Agreement by Manager, in which case Tenant's approval shall be governed by Section 12.D. Any assignment, pledge, encumbrance or transfer in contravention of the provisions of this Article 12 shall be void. Upon any such permitted sale of this Agreement by Manager in accordance with Section 12.D hereof, Consultant shall assign the Consultant Agreement to the principal owner of the permitted assignee, and Tenant shall replace Consultant under the Consulting Agreement with the principal of the permitted assignee as the new Consultant.

B.   Notice of Proposed Transfer. If Manager shall at any time or times during the Term desire to assign this Agreement, Manager shall give notice thereof to Tenant, which notice shall be accompanied by (i) a conformed or photostatic copy of the proposed assignment, the effective or commencement date of which shall be not less than thirty (30) nor more than ninety (90) days after the giving of such notice, (ii) a statement setting forth in reasonable detail the identity of the proposed assignee, the nature of its business and its proposed use of the Restaurant, (iii) current financial information with respect to the proposed assignee, including, without limitation, its most recent financial report, (iv) an agreement by Manager to indemnify Tenant against liability resulting from any claims that may be made against Tenant by the proposed assignee or by any brokers or other persons claiming a commission or similar compensation in connection with the proposed assignment and (v) such additional information related to the proposed assignee as Tenant shall reasonably request, if any.

C.   Tenant's Options.   Tenant shall provide written notice of its decision to approve or disapprove the proposed assignment or other transfer by written notice to Manager no later than twenty (20) days after the notice and information required pursuant to Section 12.A hereof has been given by Manager to Tenant, and during such twenty (20) day period Manager shall not assign this Agreement nor delegate any of its duties hereunder.

D.   Conditions for Tenant's Approval.   Provided that Manager is not in default of any of Manager's obligations under this Agreement (after notice and the expiration of any applicable grace period) as of the time of Tenant's consent, and as of the effective date of the

proposed assignment, Tenant's consent (which must be in writing and form reasonably satisfactory to Tenant) to the proposed assignment shall not be unreasonably withheld, delayed or conditioned, provided and upon condition that:

      (i)    Manager shall have complied with the provisions of Subsection B of this Article 12 within the time permitted therefor;

      (ii)    In Tenant's reasonable judgment the proposed assignee is engaged in a business or activity, and the Restaurant, or the relevant part thereof, will be used in a manner, which (a) is in keeping with the then standards of the Hotel, (b) is limited to the Permitted Uses, and (c) will not violate any negative covenant as to use contained in any other lease of space in the Building;

      (iii)    The proposed assignee is a reputable person of good character and with sufficient financial worth considering the responsibility involved, and the proposed assignee and its officers and shareholders, members or other equitable owners satisfy standards for maintenance of Tenant's liquor license at Restaurant Premises and New York State Liquor Board rules and regulations, and Tenant has been furnished with reasonable proof of the foregoing;

      (iv)    The form of the proposed instrument of assignment (a) shall be in form and substance reasonably satisfactory to Tenant, and, without limitation, agreeing to be bound by all of the terms and conditions of this Agreement, and (b) shall comply with the applicable provisions of this Article 12;

      (v)    The Consulting Agreement shall be simultaneously assigned to the principal shareholder, member or other equitable owner of the proposed assignee, pursuant to an assignment in form and substance reasonably acceptable to Tenant, who shall agree to perform Consultant's obligations thereunder and be bound by all of its terms and conditions thereafter accruing;

      (vi)    Within five (5) days after receipt of a bill therefor, Manager shall reimburse Tenant for the reasonable costs that may be incurred by Tenant in connection with such assignment, including without limitation the costs of making investigations as to the acceptability of the proposed assignee, and reasonable legal costs incurred by Tenant in connection with the granting of any requested consent, not to exceed, however, $4,000 (as increased at the rate of five percent (5%) per annum compounded annually during the term of this Agreement);

      (vii)    The Restaurant shall not be subdivided in any way and there shall not be more than one (1) occupant of the Restaurant;

      (viii)    The proposed assignee shall not be entitled, directly or indirectly, to diplomatic or sovereign immunity and shall be subject to the service of process in, and the jurisdiction of the courts of New York State.

197178-11w

24

Notwithstanding the foregoing, Tenant may withhold its consent to any proposed assignment or transfer unless and until Manager has cured all outstanding defaults under this Agreement of which Manager has been notified. Notwithstanding any assignment of this Agreement permitted under this Article 12, and notwithstanding any acceptance of revenues from the operation of the Restaurant, payment of all or any portion of the Tenant Fixed Fee or Additional Charges by Tenant from any assignee, Manager shall and will remain fully liable for the full performance of all the covenants, agreements, terms, provisions and conditions contained in this Agreement on the part of Manager to be performed through the date of such permitted assignment and all acts and omissions of Manager through and including the date of the permitted assignment of this Agreement If Tenant shall, in good faith or otherwise as permitted in accordance with this Agreement, decline to give its consent to any proposed assignment, Manager shall indemnify, defend and hold harmless Tenant against and from any and all loss, liability, damages, costs, and expenses (including reasonable counsel fees) resulting from any claims that may be made against Tenant by the proposed assignee or by any brokers or other persons claiming a commission or similar compensation in connection with the proposed assignment.

F.    Future Requests.    In the event that Tenant consents to a proposed assignment, and Manager fails to execute and deliver the assignment to which Tenant consented within one hundred twenty (120) days after the giving of such consent, then, Manager shall again comply with all of the provisions and conditions of Subsection B of this Article 12 before assigning this Agreement.

G.    Other Transfers.    The provisions of Subsection A of this Article 12 shall apply to a transfer (by one or more transfers) of a majority interest in the control of Manager or of a majority stock or economic interest in Manager, as if such transfers were an assignment of this Agreement, other than a transfer that occurs upon death to the estate of the deceased by operation of law.

H.    Assumption by Assignee.    Any assignment or transfer, whether made with Tenant's consent pursuant to Subsection A of this Article 12 or without Tenant's consent pursuant to Subsection E of this Article 12, shall be made only if, and shall not be effective until, the assignee shall execute, acknowledge and deliver to Tenant an agreement in form and substance satisfactory to Tenant whereby the assignee shall assume the obligations of this Agreement on the part of Manager to be performed or observed from and after the effective date of the transfer and whereby the assignee shall agree that the provisions in Subsection A of this Article 12 shall, notwithstanding such assignment or transfer, continue to be binding upon it in respect of all future assignments and transfers. The original named Manager covenants that, notwithstanding any assignment or transfer, whether or not in violation of the provisions of this Agreement, and notwithstanding the acceptance of revenues from the operation of the Restaurant, payment of all or any portion of the Tenant Fixed Fee and/or Additional Charges by Tenant from an assignee, transferee or any other party, the original named Manager shall remain fully liable for the payment of such revenues, the Tenant Fixed Fee and Additional Charges and for the other obligations of this Agreement on the part of Manager to be performed or observed through the effective date of such transfer or assignment.

197178-11w                                    25

1.    Liability of Manager. The joint and several liability of Manager and any immediate or remote successor in interest of Manager and the due performance of the obligations of this Agreement on Manager's part to be performed or observed shall not be discharged, released or impaired in any respect by any agreement or stipulation made by Tenant extending the time, or modifying any of the obligations, of this Agreement, or by any waiver or failure of Tenant to enforce any of the obligations of this Agreement.

13.    CONDITION OF THE RESTAURANT.    Except as otherwise expressly provided in this Agreement, Manager agrees to accept possession of the Restaurant in the physical condition which shall exist on the Commencement Date "as is", and further agrees that neither Owner nor Tenant shall have any obligation to perform any work or make any installations in order to prepare the Restaurant for Manager's occupancy. The taking of possession of the Restaurant by Manager shall be conclusive evidence as against Manager that, at the time such possession was so taken, the Restaurant and the Building were in good and satisfactory condition.

14.    ACCESS TO RESTAURANT.

A.    General. Manager shall permit Owner or Tenant, Owner's or Tenant's agents and public utilities servicing the Building to erect, use and maintain, concealed ducts, pipes and conduits in and through the Restaurant. Owner and Tenant or their respective agents shall have the right to enter the Restaurant during business hours upon at least 24 hours advance notice to examine the same, to show them to prospective purchasers, mortgagees or lessees of the Building or space therein; provided, however, that such inspection or showing shall be conducted in a manner to minimize interference with Manager's normal business operations. Owner and Tenant or their respective agents shall have the right to enter the Restaurant upon at least 24 hours advance notice, at any time whether during or after normal business hours, to make such decorations, repairs, alterations, improvements or additions as Owner or Tenant may deem necessary or desirable to the Restaurant or to any other portion of the Building or which Tenant may elect to perform following Manager's failure to make repairs or perform any work which Manager is obligated to perform under this Agreement, or for the purpose of complying with laws, regulations or other requirements of government authorities and Owner or Tenant shall be allowed to take all material into and upon the Restaurant that may be required therefor without the same constituting a breach of this Agreement and the Tenant Fixed Fee shall in no wise abate while said decorations, repairs, alterations, improvements or additions are being made, by reason of loss or interruption of business of the Restaurant, or otherwise. During the one (1) year prior to the Expiration Date, Tenant may exhibit the Restaurant to prospective managers or sub-tenants thereof. If Manager shall not be personally present to open and permit an entry into the Restaurant, at any time in or during an emergency Owner or Tenant or any of their respective agents enter the same by a master key, or may forcibly enter the same, without rendering Owner, Tenant or such agents liable therefor (if during such entry Owner or Tenant or such agents shall accord reasonable care to Manager's property), and without in any manner affecting the obligations and covenants of this Agreement. Nothing herein contained, however, shall be deemed or construed to impose upon Tenant any obligation, responsibility or liability whatsoever, for the care, supervision or repair of the Building or any part thereof, other than as herein provided. Owner and Tenant also shall have the right at any time, without the same constituting a breach of this Agreement and without incurring any liability to Manager therefor,

to change the arrangement and/or location of entrances or passageways, doors and doorways, and corridors, elevators, stairs, toilets or other public parts of the Building and to change the name, number or designation by which the Building is commonly known. Owner and Tenant and, with Tenant's prior written consent, Manager, shall have the right at any time during the Term to close or seal the rear entrance to the Restaurant which leads to the Building lobby, if any (unless prohibited by Legal Requirements). In addition, Manager understands and agrees that Owner may perform substantial renovation work in and to the public parts of the Building and the mechanical and other systems serving the Building (which work may include the replacement of the building exterior facade and window glass, requiring access to the same from within the Restaurant), and that neither Owner nor Tenant shall incur any liability to Manager, nor shall Manager be entitled to any abatement of Operating Fees on account of any noise, vibration or other disturbance to Manager's business at the Restaurant (provided that Manager is not denied access to said Restaurant) which shall arise out of the performance by Owner of the aforesaid renovations of the Building. Manager understands and agrees that all parts (except the parts facing the interior of the Restaurant) of all walls, windows and doors bounding the Restaurant (including exterior Building walls, core corridor walls, doors and entrances), all balconies, terraces and roofs adjacent to the Restaurant, all space in or adjacent to the Restaurant used for shafts, stacks, stairways, chutes, pipes, conduits, ducts, fan rooms, heating, air cooling, plumbing and other mechanical facilities, service closets and other Building facilities are not part of the Restaurant, and Owner or Tenant shall have the use thereof, as well as access thereto through the Restaurant for the purposes of operation, maintenance, alteration and repair.

B.    Use of Existing Equipment, Etc.    Notwithstanding the foregoing, the Manger shall have the right to use, or in its discretion discard, all equipment, furniture, furnishings and other personal property situated in the Restaurant as of the Commencement Date at Manager's sole cost and expense (but with no charge therefore payable to Tenant) and may use any such equipment or property as a "trade in" for new or additional equipment, other than the following, which shall be removed by, and be the property of, the Tenant: (i) the refrigeration equipment under or serving the bar; (ii) the china; and (iii) six tables and associated sets of chairs. The Manager shall further have the right to use all stacks, balconies, chutes, pipes, conduits, ducts and set backs to the extent that they are now used for the operation of the Restaurant, and may in its discretion expand such use if reasonably required for the use of the Restaurant subject to the terms and conditions of this Agreement regarding alterations by the Manager.

C.    Right of Tenant to Close for Private Parties.    Manager may limit access to the Restaurant for Hotel guests and the general public, and permit entrance for participants in private parties provided that the following conditions are met: (i) the private party is not scheduled or held during Operating Hours; (ii) the Manager makes best efforts to serve Hotel guests who wish to use the Restaurant during such time; (iii) Manager notifies Tenant at least two (2) days in advance of the time, duration and nature of the party, including the anticipated number of guests.

15.    CERTIFICATE OF OCCUPANCY; PERMITS.    Manager shall not at any time use or occupy the Restaurant in violation of the certificate of occupancy issued for the Restaurant or for the Building and in the event that any department of the City or State of New York shall hereafter at any time contend and/or declare by notice, violation, order or in any other manner whatsoever that the Restaurant are used for a purpose which is a violation of such certificate of

197178-11w                                      27

occupancy whether or not such use shall be a Permitted Use, Manager shall, upon five (5) days' written notice from Tenant, immediately discontinue such use of the Restaurant. Failure by Manager to discontinue such use after such notice shall be considered a default in the fulfillment of a covenant of this Agreement and Tenant shall have the right to terminate this Agreement immediately, and in addition thereto shall have the right to exercise any and all rights and privileges and remedies given to Tenant by and pursuant to the provisions of Articles 17 and 18 hereof. If or to the extent required by applicable law by reason of Manager's operation of the Restaurant, Manager shall be responsible for obtaining, complying with and maintaining a public assembly permit and any and all other permits or licenses required to operate the Restaurant, except the liquor licenses described in Section 1.G hereof.

16.    **TENANT'S LIABILITY.**    As further provided in Section 40.L hereof, Tenant shall convey this Agreement and its interest in the Restaurant Lease in connection with the sale or other transfer of the Hotel by the Owner to the purchaser or other transferee of the Hotel or to its designated affiliate, who shall assume the obligations of Tenant under this Agreement from and after the effective date of such transfer. The obligations of Tenant under this Agreement shall not be binding upon Tenant named herein after any termination of or sale, conveyance, assignment or transfer by Tenant of the Restaurant Lease, and in the event of any such sale, conveyance, assignment or transfer, Tenant shall be and hereby is entirely freed and relieved of all covenants and obligations of Tenant hereunder which thereafter accrue, and it shall be deemed and construed without further agreement between the parties or their successors in interest, or between the parties and the purchaser, grantee, assignee or other transferee that such purchaser, grantee, assignee or other transferee has assumed and agreed to carry out any and all covenants and obligations of Tenant hereunder from and after the effective date of such termination, sale, conveyance, assignment or other transfer. Neither the shareholders, directors or officers of Tenant, if Tenant is a corporation, nor the partners comprising Tenant (nor any of the shareholders, directors or officers of such partners), if Tenant is a partnership, nor any member of Tenant, if Tenant is a limited liability company (collectively, the "**Parties**"), shall be liable for the performance of Tenant's obligations under this Agreement. Manager shall look solely to Tenant to enforce Tenant's obligations hereunder and to Owner to enforce Owner's obligations hereunder, and shall not seek any damages against any of the Parties. The liability of Tenant for Tenant's obligations under this Agreement shall not exceed and shall be limited to Owner's interest in the Building and Manager shall not look to any other property or assets of Tenant or the property or assets of any of the Parties in seeking either to enforce Tenant's obligations under this Agreement or to satisfy a judgment for Tenant's failure to perform such obligations.

17.    **DEFAULT.**

    A.    **Events of Default.**    This Agreement is subject to the limitations that upon the occurrence, at any time prior to or during the Term, of any one or more of the following events (referred to as "**Events of Default**"):

        (1)    if Manager shall default in the payment when due of any Tenant Fixed Fee or Additional Charge, and such default shall continue for a period of ten (10) days (or ten (10) days after Manager receives notice thereof in the case of Manager's obligation to pay Additional Charges); or

197178-11w                                    28

(2)    if Manager shall default in the observance or performance of any term, covenant or condition of this Agreement on Manager's part to be observed or performed (other than the covenants for the payment of the Tenant Fixed Fee and Additional Charges) and Manager shall fail to remedy such default within thirty (30) days after notice by Tenant to Manager of such default, or if such default is of such a nature that it cannot be completely remedied within said period of thirty (30) days and Manager shall not commence within said period of thirty (30) days, or shall not thereafter diligently prosecute to completion all steps necessary to remedy such default; or

(3)    if Consultant shall materially default under the Consulting Agreement, which default continues beyond any applicable notice and cure periods provided in the Consulting Agreement; or

(4)    if the Restaurant shall become vacant, deserted or abandoned; or

(5)    if Manager's interest in this Agreement shall devolve upon or pass to any person, whether by operation of law or otherwise, except as may be expressly permitted under Article 12 hereof; or

(6)    if Manager shall file a voluntary petition in bankruptcy or insolvency, or shall be adjudicated a bankrupt or insolvent, or shall file any petition or answer seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under the present or any future federal bankruptcy act or any other present or future applicable federal, state or other statute or law, or shall make an assignment for the benefit of creditors or shall seek or consent to or acquiesce in the appointment of any trustee, receiver or liquidator of Manager or of all or any part of Manager's property; or

(7)    if, within thirty (30) days after the commencement of any proceeding against Manager, whether by the filing of a petition or otherwise, seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under the present or any future federal bankruptcy act or any other present or future applicable federal, state or other statute or law, such proceeding shall not have been dismissed, or if, within thirty (30) days after the appointment of any trustee, receiver or liquidator of Manager, or of all or any part of Manager's property, without the consent or acquiescence of Manager, such appointment shall not have been vacated or otherwise discharged, or if any execution or attachment shall be issued against Manager or any of Manager's property pursuant to which the Restaurant shall be taken or occupied or attempted to be taken or occupied;

then, at any time after the occurrence of such Event of Default and so long as such Event of Default is continuing, Tenant may, at Tenant's option, give to Manager a thirty (30) days' notice of termination of this Agreement and, in the event such notice is given, unless such default is cured prior to the expiration of such thirty (30) day period (or, if the default is not a monetary default and is not reasonably curable within such thirty (30) days, unless the Manager commences to cure such default within such thirty (30) days and continues to diligently

prosecute the remedy of such default until cured), this Agreement and the Term shall come to an end and expire (whether or not the Term shall have commenced) upon the expiration of said period, automatically and without the necessity of any further action by Tenant, with the same effect as if the date of expiration of said period were the Expiration Date, but Manager shall remain liable for damages as provided in Article 18 hereof.

B.   Effect of Bankruptcy. If, at any time, (i) Manager shall be comprised of two (2) or more persons, or (ii) Manager's obligations under this Agreement shall have been guaranteed by any person other than Manager, or (iii) Manager's interest in this Agreement shall have been assigned, the word "Manager", as used in clauses (6) and (7) of Subsection A of this Article 17, shall be deemed to mean any one or more of the persons primarily or secondarily liable for Manager's obligations under this Agreement. Any monies received by Tenant from or on behalf of Manager during the pendency of any proceeding of the types referred to in said clauses (6) and (7) shall be deemed paid as compensation for the use, operation and occupation of the Restaurant and the acceptance of any such compensation by Tenant shall not be deemed an acceptance of Operating Fees or a waiver on the part of Tenant of any rights under said Subsection A.

C.   Repeated Defaults.   Manager expressly recognizes that Manager's due and punctual performance of all its obligations under this Agreement throughout the term hereof is of paramount importance to Tenant, and, without limiting any of the provisions of this Agreement, Manager agrees that, if Manager (i) fails to remit revenues from the Restaurant to Tenant for more than two (2) Business Days after Manager collects them more than twice in any month or more than three times in any consecutive two months, or (ii) shall fail to pay for ten (10) days after it becomes due an installment of Tenant Fixed Fees or any Additional Charges for more than two (2) consecutive months or for a total of four (4) months during any twelve month period, or (iii) shall default in the timely performance of any other obligation of Manager under this Agreement with respect to which Tenant shall have given Manager notice of default, and such default shall occur more than three (3) times in any period of twelve (12) months, then notwithstanding that such failure or other default shall have been cured within the applicable grace period provided in this Agreement, and provided that notice of the possibility of so losing the Management Agreement is included in the last notice given prior to the exercise of such right may, without further notice of default, serve a three (3) day notice of cancellation of this Agreement as and with the effects provided in Subsection A of this Article 17.

D.   Tenant's Rights.   Manager acknowledges and agrees that Tenant will actively pursue its legal rights under this Article 17 and all other provisions of this Agreement, irrespective of any ongoing discussions or negotiations with Manager as to Manager's defaults.

18.   REMEDIES AND DAMAGES.

A.   Tenant's Remedies.   (1)   Upon any Event of Default which remains uncured after any applicable notice and cure periods provided in this Agreement with respect to such event, or if this Agreement and the Term shall expire and come to an end as provided in Article 17:

197178-11w                                         30

(a)     Tenant and its agents and servants may immediately, or at any time after such default or after the date upon which this Agreement and the Term shall expire and come to an end, re-enter the Restaurant or any part thereof, by any applicable action or proceeding, (without being liable to indictment, prosecution or damages therefor), and may repossess the Restaurant and dispossess Manager and any other persons from the Restaurant and remove any and all of their property and effects from the Restaurant, and operate and manage the Restaurant; and

(b)     Tenant, at Tenant's option, may operate and manage the Restaurant or enter into any new management agreement providing therefor, for such term or terms ending before, on or after the Expiration Date, and upon such other terms and conditions, as Tenant, in its sole discretion, may determine. Tenant shall have no obligation to manage or operate the Restaurant or any part thereof and shall in no event be liable for refusal or failure to do so, and no such refusal or failure shall operate to relieve Manager of any liability under this Agreement or otherwise to affect any such liability; Tenant, at Tenant's option, may make such repairs, replacements, alterations, additions, improvements, decorations and other physical changes in and to the Restaurant as Tenant, in its sole discretion, considers advisable or necessary in connection with any such operation or management of the Restaurant or entry into any new sub-management agreement providing therefor, without relieving Manager of any liability under this Agreement or otherwise affecting any such liability.

(2)     Manager, on its own behalf and on behalf of all persons claiming through or under Manager, including all creditors, does further hereby waive any and all rights which Manager and all such persons might otherwise have under any present or future law to operate or manage the Restaurant, or to restore the operation of this Agreement, after any expiration or termination of this Agreement and the Term, whether such expiration or termination shall be by operation of law or pursuant to the provisions of this Agreement. In the event of a breach or threatened breach by Manager or Tenant, or any persons claiming through or under Manager or Tenant, of any term, covenant or condition of this Agreement on Manager's or Tenant's part to be observed or performed, the offended party shall have the right to enjoin such breach and the right to invoke any other remedy allowed by law or in equity. The right to invoke the remedies hereinbefore set forth are cumulative and shall not preclude either party from invoking any other remedy allowed at law or in equity.

B.     Damages.     . this Agreement and the Term shall expire and come to an end as provided in Article 17, or by any other action or proceeding, or if Tenant shall re-enter, operate and manage the Restaurant as provided in Subsection A of this Article 18, or by or under any other action or proceeding, then, in any of said events:

(i)     Manager shall pay to Tenant all Tenant Fixed Fees, Additional Charges and other charges payable under this Agreement by Manager to Tenant to the date upon which this Agreement and the Term shall have expired and come to an end or to the date of re-entry upon the Restaurant by Tenant, if later if Manager refuses to vacate upon termination), as the case may be;

(ii)    Manager also shall be liable for and shall pay to Tenant, upon any termination of this Agreement by reason of any Event of Default hereunder, as liquidated damages for termination of this Agreement before the Expiration Date, the sum of (i) the product of twelve (12) (or such lesser number of months as remains prior to the Expiration Date) and the amount of the Tenant Fixed Fee in effect immediately preceding the termination date, and (ii) all of Tenant's expenses in connection with the termination of this Agreement, including but not limited to any legal fees due under Article 18.C below, and (iii) any alteration costs and other expenses incurred by Tenant to prepare the Restaurant Premises for new management. The Manager acknowledges and agrees that actual damages from a termination of this Agreement prior to the Expiration Date are difficult to measure and discern, and agrees that the amount of liquidated damages provided for in this Article 18.B(ii) are a fair and reasonable in amount.

C.    Legal Fees.    (1)    Manager hereby agrees to pay, as Additional Charges, all attorneys' fees and disbursements (and all other court costs or expenses of legal proceedings) which Tenant may incur or pay out by reason of, or in connection with any appearance by Tenant or Owner (or any officer, member, partner or employee of Tenant or Owner) as a witness or otherwise in any action or proceeding whatsoever involving or affecting Manager, Tenant, Owner and a third party claimant against Manager. In any action or proceeding of Manager against Tenant, or of Tenant against Manager, related to this Agreement or the enforcement hereof, the non-prevailing party shall pay the prevailing party's court or arbitration costs and reasonable attorneys fees incurred in connection with such action or proceeding promptly upon obtaining a final unappealable judgment or order, or the conclusion of binding arbitration, as applicable, or acceptance by the parties of the judgment of arbitrators in any non-binding arbitration or alternative dispute resolution. In any action or proceeding involving multiple claims, the prevailing party shall be the party who prevails on the resolution of the claims by a preponderance determined by the economic results of the judgment, order or settlement.

(2)    The party's obligations under this Subsection C shall survive the expiration of the Term hereof or any earlier termination of this Agreement. This provision is intended to supplement (and not to limit) other provisions of this Agreement pertaining to indemnities and/or attorneys' fees.

19    FEES AND EXPENSES.

A.    Curing Manager's Defaults.    If Manager shall default in the observance or performance of any term or covenant on Manager's part to be observed or performed under or by virtue of any of the terms or provisions in any Article of this Agreement, Tenant may immediately or at any time thereafter on five (5) days' notice perform the same for the account of Manager, and if Tenant makes any expenditures or incurs any obligations for the payment of money in connection therewith including, but not limited to reasonable attorneys' fees and disbursements in instituting, prosecuting or defending any action or proceeding, such sums paid or obligations incurred with interest and costs shall be deemed to be Additional Charges hereunder and shall be paid by Manager to Tenant within five (5) days of rendition of any bill or statement to Manager therefor.

197178-11w                                                    32

B.   Late Charges. (i)   If any installment of Tenant Fixed Fees or any Additional Charges shall not be paid within ten (10) days after such installment of Tenant Fixed Fees or Additional Charges shall have first become due, Manager shall also pay to Tenant interest thereon from the due date until such installment of Tenant Fixed Fees or Additional Charge is fully paid at the rate of one and one-half (1-1/2%) percent per month, or the applicable maximum legal rate of interest, whichever is lower (the "Interest Rate"). Such interest charge shall be due and payable as Additional Charges with the next installment of the Tenant Fixed Fee.

(ii)   If any check delivered to Tenant in full or partial payment of any amounts due to Tenant pursuant to the terms of this Agreement shall not be honored by reason of insufficient or uncollected funds or for any other reason more than twice in any twelve (12) month period, then Tenant may require, by delivery of written notice thereof to Manager, that subsequent payments of any amounts due to Tenant pursuant to the terms of this Agreement for the next twelve (12) months be made by certified or bank check.

20.   NO REPRESENTATIONS BY TENANT.   Tenant or Tenant's agents have made no representations or promises with respect to the Building, the Land, the Restaurant or Taxes (as defined in Article 28 hereof) except as expressly set forth in this Agreement, and no rights, easements or licenses are acquired by Manager by implication or otherwise except as expressly set forth herein.

21.   END OF TERM.   Upon the expiration or other termination of the Term, Manager shall quit and surrender to Tenant the Restaurant and all management and operation thereof, broom clean, in good order and condition, ordinary wear and tear and damage for which Manager is not responsible under the terms of this Agreement excepted, and Manager may perform this covenant shall survive the expiration or sooner termination of the Term. If the last day of the Term or any renewal thereof falls on Saturday or Sunday this Agreement shall expire on the business day immediately preceding. In addition, the parties recognize and agree that the damage to Tenant resulting from any failure by Manager to timely quit and surrender possession of the Restaurant and management and operation thereof as aforesaid will be substantial, will exceed the amount of the installments of the Tenant Fixed Fees theretofore payable hereunder, and will be impossible to accurately measure. Manager therefore agrees that if possession, operation and management of the Restaurant is not surrendered to Tenant within twenty-four (24) hours after the Expiration Date or sooner termination of the Term, in addition to any other rights or remedy Tenant may have hereunder or at law, Manager shall pay to Tenant for each month and for each portion of any month during which Manager holds over in the Restaurant after the Expiration Date or sooner termination of this Agreement, a sum equal to one and one-half (1-1/2) times the aggregate of that portion of the Tenant Fixed Fees and the Additional Charges which was payable under this Agreement during the last month of the Term, which amount shall be the sole and liquidated damages under this Agreement for Manager's holding over during the period of sixty (60) days after termination of this Agreement, but thereafter Tenant may recover any and all damages suffered or incurred by reason Manager's holdover. Nothing herein contained shall be deemed to permit Manager to retain possession, operation and management of the Restaurant after the Expiration Date or sooner termination of this Agreement and no acceptance by Tenant of payments from Manager after the Expiration Date or sooner

197178-11w                                          33

termination of the Term shall be deemed to be other than on account of the amount to be paid by Manager in accordance with the provisions of this Article 21, which provisions shall survive the Expiration Date or sooner termination of this Agreement.

22.   [OMITTED.]

23.   [OMITTED.]

24.   NO WAIVER. If there be any agreement between Tenant and Manager providing for the cancellation of this Agreement upon certain provisions or contingencies and/or an agreement for the renewal hereof at the expiration of the Term, the right to such renewal or the execution of a renewal agreement between Tenant and Manager prior to the expiration of the Term shall not be considered an extension thereof or a vested right in Manager to such further term, so as to prevent Tenant from canceling this Agreement and any such extension thereof during the remainder of the original Term; such privilege, if and when so exercised by Tenant, shall cancel and terminate this Agreement and any such renewal or extension previously entered into between Tenant and Manager or the right of Manager to any such renewal or extension; any right herein contained on the part of Tenant to cancel this Agreement shall continue during any extension or renewal hereof; any option on the part of Manager herein contained for an extension or renewal hereof shall not be deemed to give Manager any option for a further extension beyond the first renewal or extended term. No act or thing done by Tenant or Tenant's agents during the Term shall be deemed an acceptance of a surrender of the management and operation of the Restaurant by Manager, and no agreement to accept such surrender shall be valid unless in writing signed by Tenant. The failure of Tenant or Manager to seek redress for violation of, or to insist upon the strict performance of, any covenant or condition of this Agreement shall not prevent a subsequent act, which would have originally constituted a violation, from having all force and effect of an original violation. The receipt by Tenant of revenues from the Restaurant, or the payment of all or any portion of the Tenant Fixed Fees or Additional Charges with knowledge of the breach of any covenant of this Agreement shall not be deemed a waiver of such breach by the Tenant. The failure of Tenant to enforce any of the Rules and Regulations set forth, or hereafter adopted, against Manager and/or any other manager, tenant or concessionaire in the Building shall not be deemed a waiver of any such Rules and Regulations, or prevent Tenant from insisting upon strict performance thereof or prevent a subsequent act which constitutes a violation thereof, from having all force and effect of an original violation. No provision of this Agreement shall be deemed to have been waived by Tenant or Manager unless such waiver be in writing signed by Tenant or Manager, as applicable. No payment by Manager or receipt by Tenant of a lesser amount than the Tenant Fixed Fees or Additional Charges herein stipulated shall be deemed to be other than on account of the earliest stipulated Tenant Fixed Fees or Additional Charges, or as Tenant may elect to apply same, nor shall any endorsement or statement on any check or any letter accompanying any check or payment as Tenant Fixed Fees or Additional Charges be deemed an accord and satisfaction, and Tenant may accept such check or payment without prejudice to Tenant's right to recover the balance of such Tenant Fixed Fees or Additional Charges or pursue any other remedy in this Agreement provided. This Agreement contains the entire agreement between the parties and all prior negotiations and agreements are merged in this Agreement. Any executory agreement hereafter made shall be ineffective to change, modify, discharge or effect an abandonment of it in whole or in part unless such

executory agreement is in writing and signed by the party against whom enforcement of the change, modification, discharge or abandonment is sought.

25.   WAIVER OF TRIAL BY JURY.   It is mutually agreed by and between Tenant and Manager that the respective parties hereto shall and they hereby do waive trial by jury in any action, proceeding or counterclaim brought by either of the parties hereto against the other on any matters whatsoever arising out of or in any way connected with this Agreement, the relationship of Tenant and Manager, Manager's use or occupancy of the Restaurant, and/or any claim of damage, or for the enforcement of any remedy under any statute, emergency or otherwise. It is further mutually agreed that in the event Tenant commences any proceeding (whether for nonpayment of Tenant Fixed Fees or Additional Charges or because Manager continues operation and management or possession of the Restaurant after the expiration or termination of the Term), Manager will not interpose any counterclaim (except for mandatory or compulsory counterclaims) of whatever nature or description in any such proceeding.

26.   INABILITY TO PERFORM.   This Agreement and the obligation of Manager to remit all revenues from the Restaurant as required by Section 1.B hereof, pay Tenant Fixed Fees and Additional Charges hereunder and perform all of the other covenants and agreements hereunder on the part of Manager to be performed shall in no way be affected, impaired or excused because Tenant is unable to fulfill any of its obligations under this Agreement expressly or impliedly to be performed by Tenant or because Tenant is unable to make, or is delayed in making any repairs, additions, alterations, improvements or decorations or is unable to supply or is delayed in supplying any equipment or fixtures if Tenant is prevented or delayed from so doing by reason of strikes or labor troubles or by accident or by any cause whatsoever reasonably beyond Tenant's control, including but not limited to, laws, governmental preemption in connection with a national emergency or by reason of any rule, order or regulation of any federal, state, county or municipal authority or any department or subdivision thereof or any government agency or by reason of the conditions of supply and demand which have been or are affected by war or other emergency. However, if Manager cannot operate the Restaurant because of an act or omission of Tenant that prevents delivery to Manager of essential services (such as electricity, water, gas, heat in winter) which continues for more than fifteen (15) consecutive days, then Manager's obligation to pay the Tenant Fixed Fee shall abate from and after such fifteenth day until such services are restored to such level that Manager can or does resume operation of the Restaurant.

27.   BILLS AND NOTICES.   Except as otherwise expressly provided in this Agreement, any bills, statements, notices, demands, requests or other communications given or required to be given under this Agreement shall be deemed sufficiently given or rendered if in writing, sent by registered or certified mail (return receipt requested) addressed (a) to Manager (i) at Manager's address set forth in this Agreement if mailed prior to Manager's commencing management and operation of the Restaurant, or (ii) at the Building if mailed subsequent to Manager's commencement of management and operation of the Restaurant, provided also a copy thereof is mailed to Mr. John Hawkins at 539 East 76th Street, New York, New York 10021 (or such other residence address he may provide by written notice), or (iii) at any place where Manager or any agent or employee of Manager may be found if mailed subsequent to Manager's vacating, deserting, abandoning or surrendering the Restaurant or management or operation thereof (provided also a copy thereof is mailed to Mr. John Hawkins at his residence address as provided

197178-11w                                              35

28.   ESCALATION.

   A.   Defined Terms.      In a determination of any increase in the Tenant Fixed Fee under the provisions of this Article 28, Tenant and Manager agree as follows:

      (i)   "Taxes" shall mean the aggregate amount of real estate taxes and any special or other assessments (exclusive of penalties and interest thereon) imposed upon the Land and real estate taxes or assessments imposed in connection with the receipt of income or rents from the Building to the extent that same shall be in lieu of all or a portion of the aforesaid taxes or assessments, or additions or increases thereof, including, without limitation, (a) assessments made upon or with respect to any air rights, (b) any assessments levied after the date of this Agreement for public benefits to the Land or the Building (excluding an amount equal to the assessments payable in whole or in part during or for the Base Tax Year) which assessments, if payable in installments, shall be deemed payable in the maximum number of permissible installments and there shall be included in real estate taxes for each Comparison Year (hereinafter defined) in which such installments may be paid, the installments of such assessment so becoming payable during such Comparison Year (in the manner in which such taxes and assessments are imposed as of the date hereof), and (c) business improvement district taxes and similar charges imposed on the Building and/or the Land; provided, that if because of any change in the taxation of real estate, any other tax or assessment (including, without limitation, any occupancy, gross receipts, rental, income, franchise, transit or other tax) is imposed upon Tenant or the owner of the Land or the Building, or the occupancy, rents or income therefrom, in substitution for or in addition to, any of the foregoing Taxes, such other tax or assessment shall be deemed part of the Taxes. With respect to any Comparison Year all expenses, including attorneys' fees and disbursements, experts' and other witnesses' fees, incurred in contesting the validity or amount of any Taxes for that year or in obtaining a refund of Taxes for that year shall be considered as part of the Taxes for such year.

      (ii)   "Assessed Valuation" shall mean the amount for which the Land and Building is assessed pursuant to applicable provisions of the New York City Charter and of the Administrative Code of the City of New York for the purpose of imposition of Taxes.

      (iii)   "Tax Year" shall mean the period July 1 through June 30 (or such other period as hereinafter may be duly adopted by the City of New York as its fiscal year for real estate tax purposes).

      (iv)   "Base Taxes" shall mean the Taxes payable for the Base Tax Year.

      (v)   "Base Tax Year" shall mean the Tax Year July 1, 2002 through June 30, 2003.

      (v)   "Comparison Year" shall mean any Tax Year subsequent to the Base Tax Year for any part or all of which there is an increase in the Tenant Fixed Fee pursuant to Subsection B of this Article 28.

(vi)   "Tenant's Statement" shall mean an instrument or instruments containing a comparison of any increase or decrease in the Tenant Fixed Fee for the preceding Comparison Year pursuant to the provisions of this Article 28.

B.   Escalation.   If the Taxes payable for any Comparison Year (any part or all of which falls within the Term) shall represent an increase above the Base Taxes, then the Tenant Fixed Fee for such Comparison Year and continuing thereafter until a new Tenant's Statement is rendered to Manager, shall be increased by one and one-half percent (1.5%) (hereinafter, "Manager's Proportionate Share") of such increase. The Taxes shall be initially computed on the basis of the Assessed Valuation in effect at the time Tenant's Statement is rendered (as the Taxes may have been settled or finally adjudicated prior to such time) regardless of any then pending application, proceeding or appeal respecting the reduction of any such Assessed Valuation, but shall be subject to subsequent adjustment as provided in Subsection D(i)(a) of this Article 28.

C.   Payment of Escalations.   (i)   At any time prior to, during or after any Comparison Year Tenant shall render to Manager, either in accordance with the provisions of Article 27 hereof or by personal delivery at the Restaurant, a Tenant's Statement or Statements showing a comparison of the Taxes payable for the Comparison Year with the Base Taxes, and the amount of the increase in the Tenant Fixed Fee resulting therefrom. Tenant's failure to render a Tenant's Statement and/or receive payments with respect thereto during or with respect to any Comparison Year shall not prejudice Tenant's right to render a Tenant's Statement and/or receive payments with respect thereto during or with respect to any subsequent Comparison Year, and shall not eliminate or reduce Manager's obligation to pay increases in the Tenant Fixed Fees pursuant to this Article 28 for such Comparison Year. Tenant may also at any time and from time to time, furnish to Manager a revised Tenant's Statement or Statements showing a comparison of the Taxes payable for the Comparison Year with the Base Taxes.

(ii)   With respect to an increase in the Tenant Fixed Fee resulting from an increase in the Taxes for any Comparison Year above the Base Taxes, Manager shall such amount to Tenant within ten (10) days of rendition of Tenant's Statement. At Tenant's option, Tenant may require that Taxes be paid in full or in monthly, quarterly, or other installments, based upon Tenant's reasonable estimate thereof, on any other date or dates than as presently required. in which case Manager's Proportionate Share with respect to Taxes shall be correspondingly accelerated or revised so that such payments are due upon the date or dates specified by Tenant. The benefit of any discount for any early payment or prepayment of Taxes shall accrue solely to the benefit of Tenant. and such discount shall not be subtracted from Manager's Proportionate Share of such Taxes.

(iii)   Following each Tenant's Statement, a reconciliation shall be made as follows: Manager shall be debited with any increase in the Tenant Fixed Fee shown on such Tenant's Statement and credited with the aggregate, if any, paid by Manager on account in accordance with the provisions of Subsection C(ii) for the Comparison Year in question; Manager shall pay any net debit balance to Tenant within fifteen (15) days next following rendition by Tenant, either in accordance with the provisions of Article 27 hereof or by personal delivery to the Restaurant, of an invoice for such net debit balance; any net credit balance shall be applied against the next accruing monthly installment of Tenant Fixed Fee.

D. Adjustments. (i) (a) In the event that, after a Tenant's Statement has been sent to Manager, an Assessed Valuation which had been utilized in computing the Taxes for a Comparison Year is reduced (as a result of settlement, final determination of legal proceedings or otherwise), and as a result thereof a refund of Taxes is actually received by or on behalf of Tenant, then, promptly after receipt of such refund, Tenant shall send Manager a statement adjusting the Taxes for such Comparison Year (taking into account the expenses mentioned in the last sentence of Subsection A(i) of this Article 28) and setting forth Manager's Proportionate Share of such refund and Manager shall be entitled to receive such Share by way of a credit against the Tenant Fixed Fee next becoming due after the sending of such Statement; provided, however, that (1) Manager's Share of such refund shall be limited to the amount, if any, which Manager had theretofore paid to Tenant as increased Tenant Fixed Fee for such Comparison Year on the basis of the Assessed Valuation before it had been reduced, and (2) if Manager is in default hereunder at such time, Manager shall not receive such credit until such time as such default has been cured by Manager.

(b) In the event that, after a Tenant's Statement has been sent to Manager, the Assessed Valuation which had been utilized in computing the Base Taxes is reduced (as a result of settlement, final determination of legal proceedings or otherwise) then, and in such event: (1) the Base Taxes shall be retroactively adjusted to reflect such reduction, (2) the monthly installment of Tenant Fixed Fee shall be increased accordingly and (3) all retroactive charges resulting from such retroactive adjustment shall be forthwith payable when billed by Tenant as an Additional Charge. Tenant promptly shall send to Manager a statement setting forth the basis for such retroactive adjustment and Additional Charges related thereto.

(ii) Any Tenant's Statement sent to Manager shall be conclusively binding upon Manager unless, within thirty (30) days after such statement is sent, Manager shall (a) pay to Tenant the amount set forth in such statement, without prejudice to Manager's right to dispute the same, and (b) send a written notice to Tenant objecting to such statement and specifying the particular respects in which such statement is claimed to be incorrect. The parties recognize the unavailability of Tenant's books and records because of the confidential nature thereof.

(iii) The expiration or termination of this Agreement during any Comparison Year for any part or all of which there is an increase in the Tenant Fixed Fee under this Article shall not affect the rights or obligations of the parties hereto respecting such increase and any Tenant's Statement relating to such increase may, on a pro rata basis, be sent to Manager subsequent to, and all such rights and obligations shall survive, any such expiration or termination. Any payments due under such Tenant's Statement shall be payable within twenty (20) days after such statement is sent to Manager.

29. SERVICES.

A. Air-Conditioning. (i) It is understood and agreed that at all times title to all the air conditioning units servicing the Restaurant, and all parts and equipment in connection therewith (and any replacements thereof), shall be and remain the property of Owner. Manager shall use any such air conditioning units in accordance with the rules and regulations of Owner

197178-11w                              39

and the instructions of the manufacturer thereof (including without limitation any design specifications). Manager accepts the air conditioning units, if any, in "as-is" condition on the date hereof.

(ii)    Air conditioning shall be provided to the Restaurant by means of a separate air conditioning system that services the Restaurant Premises (the "Unit"), the compressor for which is located in the Hotel's back yard, the other equipment of which is located on the Hotel's mezzanine, and the exhaust for which is vented through the Hotel roof. Manager shall maintain and operate the Unit and all related equipment and contract for and maintain regular service with a maintenance company approved by Tenant, and the cost thereof shall be an Operating Expense of the Restaurant. Duplicate originals of such maintenance contract (and all amendments and renewals thereof) shall be forwarded to Tenant. Manager's obligation to maintain the Unit shall include, but not be limited to, the periodic cleaning and/or replacement of filters, replacement of fuses and belts, the calibration of thermostats and all start-up and shut down maintenance of the Unit. Manager shall, at Tenant's sole cost and expense, perform any and all necessary repairs to, and cause any and all replacements of, the Unit. All restoration and repairs of the Unit and related equipment shall be in quality and class equal to the original. The existing Unit, if any, and any replacements thereof or additional air conditioning units installed by Manager during the Term shall be and remain at all times the property of Owner or Tenant, as applicable, and Manager shall surrender the Unit and all such repairs and replacements to Tenant in good working order and condition on the Expiration Date, ordinary wear and tear excepted, except if Manager or Tenant requires the same to be removed pursuant to Subsection H of Article 3.

B.    Heat.    Pursuant to the Restaurant Lease, Owner shall furnish heat to the Restaurant through existing Building Systems during Operating Hours and at least one hour before and after Operating Hours begin and end. Owner shall have the right, from time to time, to change the hours and/or days on which it so supplies heat to the Building. Manager shall be responsible for the maintenance, repair and replacement of any radiators and connecting pipes contained within the Restaurant, and the cost thereof shall be an Operating Expense of the Restaurant.

C.    Cleaning.    (i)    Pursuant to the Restaurant Lease, Owner, at its expense, shall cause the Building's common areas and exterior (excluding the Restaurant storefront, which shall be Manager's responsibility) to be cleaned in accordance with the Building's standard practice.

(ii)    Manager shall keep the Restaurant clean and in order, and shall keep the sidewalks and curbs adjacent thereto free from snow, ice, dirt and rubbish. The expense thereof shall be an Operating Expense of the Restaurant.

D.    Trash Removal.    (i)    Manager covenants and agrees, at its sole cost and expense, to comply with all present and future Legal Requirements and Rules and Regulations regarding the collection, sorting, separation and recycling of waste products, garbage, refuse and trash. Manager shall, at Tenant's sole cost and expense, make adequate provision for daily garbage and trash disposal, and only before 8:00 a.m. and after 7:00 p.m., using a carting

197178-11w    40

company reasonably approved by Tenant. No rubbish, refuse or waste shall be stored on the street or sidewalk adjacent to the Building. Manager, at Manager's expense, shall store any refuse generated by the consumption of food or beverages on the Restaurant in a sealed water-tight garbage container. Manager shall, on a daily basis, clean, disinfect, hose down and otherwise maintain the entire area in which Manager stores its garbage.

(ii)    Manager shall pay all costs, expenses, fines penalties or damages that may be imposed on Tenant or Manager by reason of Manager's failure to comply with the provisions of trash or recycling laws and, at Manager's sole cost and expense, shall indemnify, defend and hold Owner and Tenant harmless (including legal fees and expenses) from and against any actions, claims and suits arising from such noncompliance, utilizing counsel reasonably satisfactory to Owner and/or Tenant.

E.    Sprinkler System.    Anything elsewhere in this Agreement to the contrary notwithstanding, if the New York Board of Fire Underwriters or the New York Insurance Rating Organization or any bureau, department or official of the state or city government requires or recommends that any changes, modifications, alterations or additional sprinkler heads or other equipment be made or supplied to the sprinkler system by reason of Manager's business, or the location of the partitions, trade fixtures, or other contents of the Restaurant, then Manager shall, at Manager's expense, or, at Tenant's election, Tenant shall, at Tenant's expense, promptly make and supply such changes, modifications, alterations, additional sprinkler heads or other equipment (pursuant to submission of necessary engineering plans and specifications for Tenant's reasonable approval), whether the work involved shall be structural or non-structural in nature. Such expense shall be an Operating Expense of the Restaurant.

F.    Water. The water provided to the Restaurant is submetered. Manager shall keep the meter measuring Manager's consumption of water and all related equipment in good working order and repair in default of which Tenant may cause such meter and equipment to be replaced or repaired. The expense of such maintenance and repair, and the charges for water consumed, as shown on said meter, shall be an Operating Expense of the Restaurant, charged at the time that payment of the maintenance or repair, or corresponding water or sewer charges owed by Tenant are due and payable under the Restaurant Lease.

G.    Electricity Service.    (i)    Manager shall obtain a supply of electric current for the Restaurant by direct application to and arrangement with the public utility company serving the Building and shall arrange for the installation of the Restaurant's own electric meter with such utility company, all at its own cost and expense. The expense of electricity used by the Restaurant shall be an Operating Expense of the Restaurant.

(ii)    Any additional feeders or risers to be installed to supply Manager's additional electrical requirements and all other equipment proper and necessary in connection with such feeders or risers, shall be installed by Tenant upon Manager's request, at the sole cost and expense of Manager, provided that, in Tenant's judgment, such additional feeders or risers are necessary and are permissible under applicable laws and insurance regulations and the installation of such feeders or risers will not cause permanent damage or injury to the Building or the Restaurant or cause or create a dangerous or hazardous condition or entail excessive or

unreasonable alterations or interfere with or disturb other Managers or occupants of the Building. Tenant shall be responsible for obtaining any necessary approval or consent of Owner to such Alterations, and coordinating the installation thereof with Owner. Manager covenants that at no time shall the use of electrical energy servicing the Restaurant exceed the capacity of the existing feeders or wiring installations then serving the Restaurant. Manager shall not make or perform, or permit the making or performance of, any Alterations to wiring installations or other electrical facilities in or serving the Restaurant without the prior consent of Tenant in each instance. Any such Alterations, additions or consent by Tenant shall be subject to the other provisions of this Agreement including, but not limited to, the provisions of Article 3 hereof.

(iii)   Neither Owner nor Tenant shall be liable to Manager in any way for any interruption, curtailment or failure, or defect in the supply or character of electricity furnished to the Restaurant by reason of any requirement, act or omission of Owner or Tenant or of any public utility or other company servicing the Building with electricity or for any other reason except Owner's or Tenant's gross negligence or willful misconduct. If either the quantity or character of electrical service is changed by the public utility or other company supplying electrical service to the Building or is no longer available or suitable for Manager's requirements, no such change, unavailability or unsuitability shall constitute an actual or constructive eviction, in whole or in part, or entitle Manager to any abatement or diminution of Tenant Fixed Fees, or relieve Manager from any of its obligations under this Agreement, or impose any liability upon Owner or Tenant, or their respective agents, by reason of inconvenience or annoyance to Manager, or injury to or interruption of Manager's business, or otherwise; provided, however, that if such diminution in electrical service to the Premises will or is likely to continue for at least six (6) months and such electrical service will be insufficient, in Manager's reasonable judgment, to profitably operate the Restaurant, Manager may terminate this Agreement upon not less than two (2) months' prior written notice.

H.   Interruption of Services.   Pursuant to the Restaurant Lease, Owner reserves the right to stop the service of the heating system, electrical, plumbing or other mechanical systems or facilities in the Building when necessary, by reason of accident or emergency, or for repairs, additions, alterations, replacements, decorations or improvements in the judgment of Owner desirable or necessary to be made, until said repairs, alterations, replacements or improvements shall have been completed, provided, that Owner shall use commercially reasonable efforts to restore such services as quickly as practicable. Neither Owner nor Tenant shall have any responsibility or liability for interruption, curtailment or failure to supply cooled or outside air, heat, elevator, plumbing or electricity when prevented by exercising its right to stop service or by strikes, labor troubles or accidents or by any cause whatsoever reasonably beyond Owner's or Tenant's control, or by failure of independent contractors to perform or by laws, orders, rules or regulations of any federal, state, county or municipal authority, or failure of suitable fuel supply, or inability by exercise of reasonable diligence to obtain suitable fuel or by reason of governmental preemption in connection with a National Emergency or by reason of the conditions of supply and demand which have been or are affected by war or other emergency.

I.   Plate Glass.   Manager shall be responsible for all breakage or injury to any glass windows or other plate glass within the Restaurant and shall maintain insurance, at its sole cost

and expense, to cover all such breakage or injury. Subject to the provisions of Article 5, Manager shall keep the windows of the Restaurant clean at all times.

J.    Gas.    (i)    If gas is used in the Restaurant, Manager shall obtain a supply of gas for the Restaurant by direct application to and arrangement with the public utility company serving the Building, and shall arrange for the installation of a gas meter for the Restaurant with such utility company at Manager's sole cost and expense. Manager shall install gas cut-off devices, both manual and automatic, also at Manager's own expense. The expense of gas used by the Restaurant shall be an Operating Expense of the Restaurant.

(ii)    Neither Owner nor Tenant shall be liable to Manager in any way for any interruption, curtailment or failure, or defect in the supply or character of gas furnished to the Restaurant by reason of any requirement, act or omission of Owner or Tenant or of any public utility or other company servicing the Building with gas or for any other reason except Owner's or Tenant's gross negligence or willful misconduct. If either the quantity or character of gas service is changed by the public utility or other company supplying gas to the Building or is no longer available or suitable for Manager's requirements, no such change, unavailability or unsuitability shall constitute an actual or constructive breach or termination of this Agreement or eviction of Manager's occupancy, in whole or in part, or entitle Manager to any abatement or diminution of Operating Fees, or relieve Manager from any of its obligations under this Agreement, or impose any liability upon Tenant, or its agents, by reason of inconvenience or annoyance to Manager, or injury to or interruption of Manager's business, or otherwise.

K.    Chemical Extinguishing Devices.    Manager shall, at its sole cost and expense, install chemical extinguishing devices (such as Ansul or equal) approved by the Fire Insurance Rating Organization and shall, at its sole cost and expense, keep such devices in service throughout the Term.

L.    Ventilation System.    Manager shall, at its sole cost and expense, maintain the ventilation and filtration system (including necessary flue, vent and shaft connections) at the Restaurant (the "Ventilation System"), which shall adequately eliminate all odors in and about the Restaurant. In the event that the Ventilation System is inadequate to eliminate all odors in and about the Restaurant, as determined by Tenant in its reasonable discretion, Manager shall, at Manager's sole cost and expense, make all modifications, repairs or replacements thereto so as to adequately eliminate all such odors.

30.    COMPOSITION OF MANAGER; ISSUANCE OF INTERESTS IN MANAGER. Manager and John Hawkins each covenant that Manager is a corporation whose President, sole director and shareholder at this time is John Hawkins. Manager and John Hawkins each covenant that Manager will not issue additional stock or other securities in the Manager or transfer membership stock or other securities in the Manager such that John Hawkins does not retain at least fifty one percent of each class of the stock and securities of the Manager and retain sole management authority over Manager, nor hire, admit or appoint any person other than John Hawkins as President or chief executive officer other than John Hawkins, without in each case the prior written approval of Tenant, which may be withheld or granted in Tenant's sole and absolute discretion, it being acknowledged and agreed by Manager and John Hawkins that the

personal management services provided by John Hawkins are a material inducement to Tenant to enter into this Agreement. Notwithstanding the foregoing, Tenant will consent to a sale of all or substantially all of the stock in Manager if Manager and the intended transferee(s) comply with and satisfy all conditions of Article 12 hereof as if such transaction were a sale or other transfer of this Agreement by Manager to such transferee(s).

31.   **VAULT SPACE.**   Any vaults, vault space or other space outside the boundaries of the Land or Building, notwithstanding anything contained in this Agreement or indicated on any sketch, blueprint or plan are not included in the Restaurant. Tenant makes no representation as to the location of the boundaries of the Land or Building. All vaults and vault space and all other space outside the boundaries of the Land or Building which Manager may be permitted to use or occupy is to be used or occupied under a revocable license, and if any such license shall be revoked, or if the amount of such space shall be diminished or required by any Federal, State or Municipal authority or by any public utility company, such revocation, diminution or requisition shall not constitute a breach of this Agreement or an actual or constructive eviction of Sub-Manager's occupancy rights hereunder, in whole or in part, or entitle Manager to any abatement or diminution of Tenant Fixed Fees, or relieve Manager from any of its obligations under this Agreement, or impose any liability upon Tenant. Any fee, tax or charge imposed by any governmental authority for any such vaults, vault space or other space shall be an Operating Expense of the Restaurant entirely if such space is utilized by Manager and otherwise proportionally to the square footage of the Restaurant (in comparison with the square footage of the Hotel).

32.   **DEPOSIT.**

A.   **Deposit.**   Tenant and Manager acknowledge that Manager has deposited with Tenant the initial sum of $19,500 (such amount, as adjusted from time to time as provided in this Article 32.A, the "Deposit") as security for the faithful performance and observance by Manager of the terms, provisions and conditions of this Agreement, including but not limited to the payment of Tenant Fixed Fees and Additional Charges. The amount of the Deposit required to be made by Manager shall at all time be equal to three (3) times the Tenant Fixed Fee charged hereunder, and Manager shall make such additional deposit with Tenant as is required to adjust the Deposit to this level within ten days of the date that any increased Tenant Fixed Fee charged hereunder is due. The parties agree that the Deposit shall remain on deposit with the Tenant and that Tenant may use, apply or retain the whole or any part of the Deposit to the extent required for the payment of any Tenant Fixed Fees and Additional Charges or any other sum as to which Manager is in default or for any sum which Tenant may expend or may be required to expend by reason of Manager's default in respect of any of the terms, covenants and conditions of this Agreement, including but not limited to, any damages or deficiency due following an Event of Default hereunder, whether such damages or deficiency accrued before or after legal proceedings or re-entry upon, or assumption of operation and management of the Restaurant by Tenant. If any portion of the Deposit is applied by Tenant to any default by Manager under this Agreement, Manager shall restore the sum so applied within five (5) days after written notice from Tenant demanding such restoration and the amount to be restored shall be deemed Additional Charges. Tenant shall have no liability or obligation to Manager for any loss suffered by Manager by reason of the placement by Tenant of the Deposit into any commercial or savings bank account.

Notwithstanding the foregoing, Tenant shall deposit the Deposit into a separate interest-bearing savings account provided that Manager shall pay the initial fees of opening such account and the monthly fees on such account, if any. If Manager fails to timely pay such fees for more than two consecutive months, Tenant may close such account and deposit the Deposit into a non-interest bearing account.

B.    Application of Deposit.    In the event that Manager defaults beyond the giving of notice and the expiration of applicable grace periods in respect of any of the terms, provisions and conditions of this Agreement, including, but not limited to, the payment of Tenant Fixed Fees and Additional Charges, Tenant may apply or retain the whole or any part of any cash security held by Tenant and use, apply or retain the whole or any part of such proceeds, as the case may be, to the extent required for the payment of any Tenant Fixed Fees and Additional Charges or any other sum as to which Manager is in default or for any sum which Tenant may expend or may be required to expend by reason of Manager's default in respect of any of the terms, covenants and conditions of this Agreement, including but not limited to, any damages or deficiency due to Tenant following an Event of Default hereunder, whether such damages or deficiency accrue or accrues before or after legal proceedings or reentry upon, assumption of operation and management of the Restaurant by Tenant. If Tenant applies or retains any part of any cash security, Manager, within five (5) days after notice from Tenant and at Tenant's option, shall deposit with Tenant the amount so applied or retained, so that Tenant shall have the full Deposit on hand at all times during the Term. If Manager shall fully and faithfully comply with all of the terms, provisions, covenants and conditions of this Agreement, any cash security, shall be returned to Manager after the Expiration Date and after delivery of the entire possession of the Restaurant to Tenant. In the event of a sale or other assignment of Tenant's interest in the Restaurant Lease, Tenant shall transfer any cash security or so much thereof as remains following a default by Manager to the assignee and Tenant shall thereupon be released by Manager from all liability for the return of such security. Manager agrees to look solely to the new Tenant for the return of such cash security and it is agreed that the provisions hereof shall apply to every transfer or assignment made of the Deposit to a new Tenant. Manager further covenants that it will not assign or encumber or attempt to assign or encumber any monies deposited herein as security except in connection with a sale or other transfer of this Agreement in accordance with Article 12 hereof, and that neither Tenant nor its successors or assigns shall be bound by any such assignment, encumbrance, attempted assignment or attempted encumbrance.

33.    CAPTIONS.   The Captions are inserted only as a matter of convenience and for reference and in no way define, limit or describe the scope of this Agreement nor the intent of any provision thereof.

34.    ADDITIONAL DEFINITIONS.

A.    The words " reenter" and "reentry" as used in this Agreement are not restricted to their technical legal meaning.

197178-11w                                    45

B.    The term "business days" as used in this Agreement shall exclude Saturdays, Sundays and all days observed by the State or Federal Government as legal holidays and union holidays for those unions that materially affect the delivery of services in the Building.

C.    The words "include", "including" and "such as" shall each be construed as if followed by the phrase "without being limited to". The words "herein", "hereof", "hereby", "hereunder" and words of similar import shall be construed to refer to this Agreement as a whole and not to any particular Article or subdivision hereof unless expressly so stated.

D.    The terms "substantial completion" or "substantially completed" or words of similar import shall mean that any construction work (including Alterations) has been substantially completed, it being agreed that any such work shall be deemed substantially complete notwithstanding the fact that minor or insubstantial details of construction or demolition and/or mechanical adjustment and/or decorative items remain to be performed, provided that any such unperformed work shall not materially interfere with Manager's use and occupancy of the Restaurant for the Permitted Uses.

35.    PARTIES BOUND.   The covenants, conditions and agreements contained in this Agreement shall bind and inure to the benefit of Tenant and Manager and their respective, distributees, administrators, permitted successors, and, except as otherwise provided in this Agreement, their permitted assigns.

36.    [OMITTED.]

37.    INDEMNITY. Manager shall not do or permit any act or thing to be done upon the Restaurant or Building which may subject Owner or Tenant to any liability or responsibility for injury, damages to persons or property or to any liability by reason of any violation of law or of any legal requirement of public authority, but shall exercise such control over the Restaurant as to fully protect Owner and Tenant against any such liability. Manager agrees to indemnify and save harmless Owner and Tenant from and against (a) all claims of whatever nature against Owner or Tenant arising from any act, omission or negligence of Manager, its contractors, licensees, agents, servants, employees, invitees or visitors, including any claims arising from any act, omission or negligence of Owner or Tenant, (b) all claims against Owner or Tenant arising from any accident, injury or damage ...hatsoever caused to any person or to the property of any person and occurring during the Term in or about the Restaurant, (c) all claims against Owner or Tenant arising from any accident, injury or damage to any person, entity or property, occurring outside of the Restaurant but anywhere within or about the Land, where such accident, injury or damage results or is claimed to have resulted from an act or omission of Manager or Manager's agents, employees, invitees or visitors, and (d) any breach, violation or nonperformance of any covenant, condition or agreement in this Agreement set forth and contained on the part of Manager to be fulfilled, kept, observed and performed and (e) any claim, loss or liability arising or claimed to arise from Manager, or any of Manager's contractors, licensees, agents, servants, employees, invitees or visitors causing or permitting any Hazardous Substances (hereinafter defined) to be brought upon, kept or used in or about the Restaurant or the Land or any seepage, escape or release of such Hazardous Substances. This indemnity and hold harmless agreement shall include indemnity from and against any and all liability, fines, suits, demands, costs and

expenses of any kind or nature incurred in or in connection with any such claim or proceeding brought thereon, and the defense thereof. As used herein, "Hazardous Substances" shall mean, collectively, (a) asbestos and polychlorinated biphenyls and (b) hazardous or toxic materials, wastes and substances which are defined, determined and identified as such pursuant to any law. Manager is not responsible or liable for any liability, fines, suits, demands, costs and expenses of any kind or nature incurred in or in connection with any such claim or proceeding to the extent relating to Hazardous Substances on, in or under the Premises as of the date hereof, provided, however, that Manager shall comply with all applicable law and regulations relating to the release, discharge, removal or disposal of Hazardous Substances in connection with any Alterations to the Premises made by Manager.

38.    ADJACENT EXCAVATION SHORING.    If an excavation shall be made upon land adjacent to the Restaurant, or shall be authorized to be made, Manager shall afford to the person causing or authorized to cause such excavation, license to enter upon the Restaurant for the purpose of doing such work as said person shall deem necessary to preserve the wall or the Building from injury or damage and to support the same by proper foundations without any claim for damages or indemnity against Tenant, or diminution or abatement of Operating Fees.

39.    [OMITTED.]

40.    MISCELLANEOUS.

    A.    No Offer.    This Agreement is offered for signature by Manager and it is understood that this Agreement shall not be binding upon Tenant unless and until Tenant shall have executed and delivered a fully executed copy of this Agreement to Manager.

    B.    Signatories.    If more than one person executes this Agreement as Manager, each of them understands and hereby agrees that the obligations of each of them under this Agreement are and shall be joint and several, that the term "Manager" as used in this Agreement shall mean and include each of them jointly and severally and that the act of or notice from, or notice or refund to, or the signature of, any one or more of them, with respect to the tenancy and/or this Agreement, including, but not limited to, any renewal, extension, expiration, termination or modification of this Agreement, shall be binding upon each and all of the persons executing this Agreement as Manager with the same force and effect as if each and all of them had so acted or so given or received such notice or refund or so signed.

    C.    Certificates.    From time to time, within seven (7) days next following request by Owner, Tenant or any Mortgagee, Manager shall deliver to Owner, Tenant or such Mortgagee, as the case may be, a written statement executed and acknowledged by Manager, in form satisfactory to Owner, Tenant or such Mortgagee, (i) stating that this Agreement is then in full force and effect and has not been modified (or if modified, setting forth all modifications), (ii) setting forth the date to which the Tenant Fixed Fees, Additional Charges and other charges hereunder have been paid, together with the amount of Tenant Fixed Fees then payable, (iii) stating whether or not, to the best knowledge of Manager, Tenant is in default under this Agreement, and, if Tenant is in default, setting forth the specific nature of all such defaults, (iv) stating the amount of the Deposit under this Agreement, (v) stating whether there are any

subagreements affecting the Restaurant, (vi) stating the address of Manager to which all notices and communications under this Agreement shall be sent, the Commencement Date and the Expiration Date, and (vii) as to any other matters requested by Owner, Tenant or such Mortgagee. Manager acknowledges that any statement delivered pursuant to this Subsection may be relied upon by any purchaser or owner of the Land or the Building, or Tenant's interest in the Restaurant Lease or any Superior Lease, or by any Mortgagee, or by any assignee of any Mortgagee, or by any Lessor. Similarly, from time to time, within seven (7) days next following request by Manager, Tenant shall provide a statement addressing any or all of such matters as requested by Manager.

D.    **Authority.**    If Manager is a corporation, partnership or limited liability company, each individual executing this Agreement on behalf of Manager hereby represents and warrants that Manager is a duly formed and validly existing entity qualified to do business in the State of New York and that Manager has full right and authority to execute and deliver this Agreement and that each person signing on behalf of Manager is authorized to do so.

E.    **Signage.**    (1)    Manager shall not exhibit, inscribe, paint or affix any sign, advertisement, notice or other lettering on any portion of the Building, on the outside of the Restaurant or visible from outside of the Restaurant without the prior written consent of Tenant in each instance. Notwithstanding the foregoing, Manager may place an identifying sign on Manager's storefront window subject to Tenant's approval. Upon the expiration or earlier termination of this Agreement, Manager shall promptly remove such sign at Manager's sole cost and expense and repair any damage caused by such removal. A plan of all signage or other lettering proposed to be exhibited, inscribed, painted or affixed shall be prepared by Manager in conformity with building standard signage requirements and submitted to Tenant for Tenant's consent. If the proposed signage is acceptable to Tenant, Tenant shall approve such signage or other lettering by written notice to Manager. All signage or other lettering which has been approved by Tenant shall thereafter be installed by Tenant at Manager's sole cost and expense. Payment of all charges therefor shall be deemed Additional Charges hereunder. In the event Tenant requires payment in advance for the installation of any such signage or other lettering, no installation shall be commenced by Tenant until Tenant has received payment in full.

(2)    Upon installation of any such signage or other lettering, such signage or lettering shall not be removed, changed or otherwise modified in any way without Tenant's prior written approval. The removal, change or modification of any signage or other lettering theretofore installed shall be performed solely by Tenant at Manager's sole cost and expense.

(3)    Any signage, advertisement, notice or other lettering which shall be exhibited, inscribed, painted or affixed by or on behalf of Manager in violation of the provisions of this Subsection may be removed by Tenant and the cost of any such removal shall be paid by Manager as Additional Charges.

(4)    Manager shall not install any exterior lighting fixture, shade, canopy, awning, banner, placard, flag, pennant, aerial, antenna or the like, or undertake any exterior painting or build any fences or make any other changes to the exterior of the Restaurant without Tenant's prior written consent.

197178-11w                                48

(5)    Tenant shall be responsible for securing any necessary consent or approval for actions by Manager that Tenant approves or consents to under this Article 40.E, and Tenant shall not provide consent or approval to Manager under this Article 40.E unless it first obtains any necessary approval or consent thereto from Owner.

F.    Consents and Approvals.    Wherever in this Agreement Tenant's consent or approval is required, if Tenant shall delay or refuse such consent or approval, Manager in no event shall be entitled to make, nor shall Manager make, any claim, and Manager hereby waives any claim for money damages (nor shall Manager claim any money damages by way of set-off, counterclaim or defense) based upon any claim or assertion by Manager that Tenant unreasonably withheld or unreasonably delayed its consent or approval. Manager's sole remedy shall be an action or proceeding to enforce any such provision, for specific performance, injunction or declaratory judgment.

G.    Reductions in Payments Due to Legal Requirements.    In the event the revenues from the Restaurant, Tenant Fixed Fees or Additional Charges or any part thereof provided to be paid by Manager under the provisions of this Agreement during the Term shall become uncollectible or shall be reduced or required to be reduced or refunded by virtue of any Legal Requirements, Manager shall enter into such agreement(s) and take such other steps as Tenant may reasonably request and as may be legally permissible to permit Tenant to collect the maximum amount which from time to time during the continuance of such legal restriction (but not in excess of the amounts reserved under this Agreement). Upon the termination of such legal restriction (a) the revenues from the Restaurant, the Tenant Fixed Fees or Additional Charges shall become and thereafter be payable in accordance with the amounts reserved herein for the periods following such termination, and (b) Manager shall pay to Tenant promptly upon being billed, to the maximum extent legally permissible, and amount equal to (i) the revenues from the Restaurant, Tenant Fixed Fees and/or Additional Charges which would have been paid pursuant to this Agreement but for such legal restriction, less (ii) the amounts paid by Manager during the period such legal restriction was in effect.

H.    Collective Bargaining Agreement.    (i)    By virtue of a certain agreement made between Owner and the New York Hotel and Motel Trades Council. AFL-CIO (the "Union"), Owner is a party to a certain agreement made as of June 28, 1985 between the Hotel Association of New York City. Inc. and the Union. as the same has been extended and modified from time to time, including (but not limited to) a Memorandum of Understanding dated as of January 30, 1990, a Memorandum of Understanding dated as of July 1, 1995, and a Memorandum of Understanding dated as of June 15, 2000 (which documents and any future modifications or extensions thereof are collectively referred to as the "Collective Bargaining Agreement"), and under the Restaurant Lease, Tenant is required to comply therewith in connection with the operation and management of the Hotel, unless it reaches a separate accord with the Union. Subject to the provisions of any separate agreement which may be entered into between Manager and the Union, Manager hereby covenants and agrees that all of the persons employed in job classifications covered by the Collective Bargaining Agreement will work in accordance with the schedule of hours and will receive not less than the wages and economic benefits provided in the Collective Bargaining Agreement (or any separate agreement entered

into between Manager and the Union) including holidays, vacations, premiums, overtime, health and welfare, dental, pension and/or any other economic benefits required by the Collective Bargaining Agreement or their equivalent. In addition, Manager agrees to submit any question concerning compliance with the foregoing to the Impartial Chairman designated under Section 26 of the Collective Bargaining Agreement for determination.

(ii)   Manager hereby indemnifies and holds Owner and Tenant harmless from any liability whatsoever in connection with the provisions of Sections 45(C) and 46 of the Collective Bargaining Agreement, which are set forth in **Exhibit 2** annexed hereto and made a part hereof. As used in **Exhibit 2**, "Union" shall mean the New York Hotel and Motel Trades Council, AFL-CIO, "hotel" and/or "Employer" shall mean the Dumont Plaza Hotel and/or Owner, respectively, and "Concessionaire" shall mean Manager.

(iii)   Manager shall, within twenty (20) days after receipt of written demand by Owner or Tenant, pay in full or compromise any sums due any labor union arising out of the operation of the restaurant at the Restaurant, or pay the sums to the labor union under protest, or commence such proceedings as are necessary to contest any such claim where Manager reasonably believes the claim is incorrect, whether such sum shall become due prior to or during the Term.

(iv)   Manager shall not conduct its business in any manner which would create a work stoppage, picketing, labor disruption or dispute or violate any union contracts or other labor agreements within the Building, or interfere with Tenant's business or the business of any other tenant or occupant of the Building. In the event of the occurrence of any such condition resulting from Manager's use, operation or occupancy of the Restaurant or the conduct of Manager's business at the Restaurant, Manager shall, immediately cease the conduct or activity giving rise to such condition. In the event Manager fails to cease such conduct or activity, Tenant, in addition to all other rights and remedies available to it under this Agreement or at law, shall have the right to injunctive relief.

(v)   Any and all sums assessed against or charged Tenant, as a result of Manager's non-compliance with the Collective Bargaining Agreement shall be deemed Additional Charges.

(vi)   The failure of Manager to comply with any of the foregoing or with the Collective Bargaining Agreement shall constitute a substantial breach of this Agreement and a default under this Agreement, entitling Tenant to terminate this Agreement pursuant to the provisions hereof with respect to Tenant's remedies in the event of Manager's default. The provisions of this Subsection H shall survive the expiration or sooner termination of this Agreement.

I.   <u>Owner is a Third Party Beneficiary</u>.   Manager acknowledges that its rights hereunder derive from a Primary Hotel Management Services Agreement between Tenant and Owner, that Tenant's rights to operate and manage the Restaurant, and correspondingly, Manager's rights to do so, depend on Tenant's fulfilling its obligation under that agreement, and that those conditions cannot be fulfilled unless Manager performs its obligations under this

Agreement. Manager acknowledges and agrees that Owner is intended to and shall be a third party beneficiary of this Agreement.

J.    Tenant's Approval and Consent. Manager shall have no obligation to obtain the consent or approval of Owner to any action or decision permitted to be made or taken by Manager hereunder. Tenant represents and warrants to Manager that, whenever in this Agreement Tenant's approval of or consent to any action or decision to be taken or made by Manager is required, Tenant has authority to grant such approval and consent not only on its own behalf but also on behalf of Owner, and further, that Tenant's approval or consent represents also the consent or approval of the Owner (in any matter affecting Owner or the Hotel) and shall be binding upon Owner. All references in this Agreement to the consent or approval of Tenant shall be deemed to mean the written consent of Tenant or the written approval of Tenant and no consent or approval of Tenant shall be effective for any purpose unless such consent or approval is set forth in a written instrument executed by Tenant.

K.    Certain Conflicts. Owner, Tenant and Manager agree that in the event of any conflicts between this Agreement and the Restaurant Lease, the provisions of this Agreement shall govern.

L.    Transfer of this Agreement by Owner Upon Sale or Other Transfer of the Hotel. Tenant shall cause its right, title and interest in the Restaurant Lease and this Agreement to be transferred to any purchaser or assignee of the Hotel (or to such transferee's designated affiliate) in connection with the sale or other transfer of the Hotel, and Owner shall not voluntarily sell or otherwise transfer the Hotel without a concurrent sale or other transfer of such lease and this Agreement. The consent or approval of Manager is not required to sale or other transfer of the Hotel by Owner nor to the accompanying transfer of this Agreement by the Tenant.

M.    Performance of Manager's Obligations. Manager shall reimburse and compensate Tenant as Additional Charges within five (5) days after rendition of a statement for all expenditures made by, or damages or fines sustained or incurred by, Tenant (or by Owner and chargeable to Tenant under the terms of the Restaurant Lease) due to nonperformance or noncompliance with or breach or failure to observe any term, covenant or condition of this Agreement upon Manager's part to be kept, observed, performed or complied with.

N.    Termination of Agreement Upon Failure to Qualify for Liquor License. This Agreement shall terminate and be of no further force and effect if Hawkins is determined to be ineligible for inclusion on Tenant's liquor license by the New York State alcoholic beverage authorities. Further, either party hereto may terminate this Agreement by delivery of written notice thereof if the Tenant fails to obtain a liquor license for the Premises within three (3) months after the date hereof.

O.    Certain Representations. Owner and Tenant represent and warrant that, during the term of this Agreement, Tenant will engage in no other business than lease, ownership, management, operation and ultimately disposition of the Premises, and all activities incidental or reasonably related thereto, unless and except insofar as any such additional or unrelated business activities are conducted with or through Manager. To the best of Owner's knowledge, Owner

has not received notice from any municipal or other governmental authority of any building code or other municipal violation with respect to the Premises.

P.   Indemnity Against Transferee Tax Liability.  Owner and Tenant will jointly and severally indemnify and hold Manager harmless form any and all sales tax liability or other taxes, fines or other impositions of any governmental authority imposed on Manager relating to the activities or omissions of any person or company that leased the Premises prior to the date of this Agreement.

Q.   No Third Party Beneficiaries.  This Agreement does not and is not intended to create any rights in any person, company, governmental authority or any other entity that is not a signatory party to this Agreement.

R.   Restaurant Name.  Manger will use a Restaurant name that includes "The Barking Dog." Tenant acknowledges that it has no right, title or interest in or to this name, which is used by Manager in other restaurants owned or operated by Manager, provided, however, that during the term of this Agreement, the Owner may use such name in connection with its hotel literature for guests or in advertising to indicate or describe the restaurant that is on the hotel premises. Upon the termination of this Agreement, neither Tenant nor Owner will have any further right, title or interest in or to such name.

S.   Storefront Awnings.  Manager may use the existing Restaurant storefront awnings but shall change the name thereon (at its sole cost and expense) to the new name of the Restaurant.

T.   Use of Back Yard.  Manager has a license to use the area of the Hotel's back yard marked on the attached Exhibit E during the term of this Agreement for purposes of installation of air conditioning equipment, temporary garbage storage (in sealed containers) and for erection of walk-in boxes as a temporary food preparation area; provided, however, that manager shall not install air conditioning equipment or construct the temporary walk-in boxes except in accordance with plans and specifications approved, in writing, by Tenant, and Manager shall be responsible, at its sole cost and expense, for obtaining any and all permits required under applicable law with respect to Manager's activities or use of the back yard area, and Manager shall otherwise comply with all applicable laws respecting its activities or use of the back yard.

U.   Indemnity Procedures.  In connection with any indemnity provided in this Agreement, the parties shall follow the procedures set forth in Exhibit F hereto.

V.   Guaranty.  Owner guarantees the performance of Tenant's obligations to Manager under and in accordance with the terms of his Agreement.

197178-11w                              52

IN WITNESS WHEREOF, Tenant and Manager have respectively executed this Agreement as of the day and year first above written.

TENANT:
150 EAST 34TH RESTAURANT MANGEMENT CO., LLC, Tenant

By:_____
Name:
Title:


MANAGER:
LISA RESTAURANT, INC. Manager

By:_____
John Hawkins, President


_____
Manager's Tax I.D. Number


The undersigned executes this Agreement for the sole and limited purpose of agreeing to be bound by any representations or covenants expressly made by Owner in this Agreement.

150 EAST 34TH STREET CO. LLC

By:_____
Name:
Title:


The undersigned executes this Agreement for the sole purpose of agreeing to be bound by the terms and conditions of Article 30 hereof.

_____
JOHN HAWKINS


197178-11w                      53

# EXHIBIT 1

Floor Plan of Restaurant

THIS IS A SCHEMATIC PLAN AND IS INTENDED ONLY TO SHOW THE
PROPOSED GENERAL LAYOUT OF THE RESTAURANT. ALL
MEASURES, DISTANCES AND DIMENSIONS ARE APPROXIMATE AND
NOT TO SCALE. THE DEPICTIONS HEREON DO NOT CONSTITUTE A
WARRANTY OR REPRESENTATION OF ANY KIND.

[ATTACHED]

197178-11w



## EXHIBIT 2

## COLLECTIVE BARGAINING AGREEMENT PROVISIONS[1]

45(A)  Any contract, lease or agreement entered into between a hotel and a concessionaire who employs employees in job classifications covered by this Agreement must contain a provision that the concessionaire agrees that the persons employed in the job classifications covered by this Agreement will work in accordance with the schedule of hours and will receive not less than the wages and economic benefits provided in this Agreement including holidays, vacations, premiums, overtime, health and welfare, dental, pension, legal and training and/or any other economic benefits required by this Agreement or their equivalent and that said concessionaire or lessee further agrees to submit any question concerning compliance with the foregoing to the Impartial Chairman designated under Section 26 herein for determination.  Any party affected may institute such arbitration.

(B)     All work performed on the EMPLOYER'S Restaurant and all products produced on the EMPLOYER'S Restaurant by employees covered by this Agreement as of the effective date of this Agreement shall not be performed or produced by persons not covered by this Agreement, provided that an EMPLOYER or a group of EMPLOYERS may arrange to have products and/or work presently produced and performed on its Restaurant to be performed by persons employed in job classifications covered by this Agreement provided that such persons work in accordance with the schedule of hours and will receive not less than the wages and economic benefits provided in this Agreement including holidays, vacations, premiums, overtime, health and welfare, dental, pension, legal and training and/or any other economic benefits required by this Agreement or their equivalent and further provided that the employment of those employed by the EMPLOYER or EMPLOYERS at the time of the arrangement shall not be adversely affected thereby."

(C)     With regard to any contract, lease or agreement entered into on or after July 1, 1995 between an Employer and a Concessionaire, the Employer and Concessionaire will be considered a joint employer for the purpose of this Agreement.  The Employer shall at all times hold and exercise full control of the terms and conditions of employment of employees of the joint employer for labor relations purposes with regard to the schedule of hours, wages and economic benefits provided in this Agreement including holidays, vacations, premiums, overtime, health and welfare, dental, pension, legal and training and/or any other economic benefits required by this Agreement.  The Employer's liability shall be limited as provided for in Section 46 of this Agreement.  Employees of the joint employer shall be members of the bargaining unit, as set forth in Section 2 of this Agreement."

46.     In order to insure the faithful performance of the obligations contained in this Agreement every concessionaire shall be required to furnish security in the form of cash or bond in the amount of three (3) months' wages prior to entering into its operation, or at any time

---

[1]  As used in this Exhibit 3, "Union" shall mean the New York Hotel and Motel Trades Council, AFL-CIO, "hotel" and/or "Employer" shall mean the Dumont Plaza Hotel and/or Owner, respectively, and "Concessionaire" shall mean Manager.

197178-11w

thereafter, upon demand by the UNION or hotel. Failure to demand security shall not be deemed to be a waiver of a concessionaire's obligations hereunder.

The cash or bond shall be deposited with the Impartial Chairman. In the event the Impartial Chairman finds that a default has occurred in the payment of cash wages, vacation or holiday payments, insurance fund contributions, pension fund contributions, medical fund contributions, training fund contributions, scholarship fund contributions, legal fund contributions, dental fund contributions, severance pay, or union dues, fees or assessments he shall order said payments to be made from the cash or bond on deposit with him and shall further order that the cash or bond be restored to its original amount.

In the event a concessionaire who is required to post cash or bond hereunder fails to do so, the hotel shall be responsible for any defaults.

At the termination of any contract, concession or lease the Impartial Chairman shall return the cash or bond, upon being satisfied that there are no unpaid cash wages, vacation or holiday payments, insurance or pension fund contributions, medical fund contributions, training fund contributions, scholarship fund contributions, dental fund contributions, legal fund contributions, severance pay and/or union dues, fees or assessments.

The form of the bond to be posted shall be subject to the approval of the ASSOCIATION and the UNION, or, in the case of a non-ASSOCIATION hotel, the hotel and the UNION, and if they fail to agree, the form of the bond shall be determined by the Impartial Chairman.

197178-11w

## SCHEDULE A

## RULES AND REGULATIONS

1.  The rights of Manager in the Building to the entrances, corridors and elevators of the Building are limited to ingress to and egress from Manager's Restaurant and Manager shall not use, or permit the use of the entrances, corridors, or elevators for any other purpose. Manager shall not invite to the Restaurant, or permit the visit of persons in such numbers or under such conditions as to interfere with the use and enjoyment of any of the plazas, entrances, corridors, elevators and other facilities of the Building by Hotel guests or other tenants or occupants. Manager shall not encumber or obstruct, or permit the encumbrances or obstruction of any of the sidewalks, plazas, entrances, corridors, elevators, fire exits or stairways of the Building. Owner reserves the right to control and operate the public portions of the Building other than the Restaurant, the public facilities, as well as facilities furnished for the common use of the Hotel guests, tenants and other occupants, in such manner as Owner deems best for the benefit of such persons generally.

2.  Any person whose presence in the Building at any time shall, in the reasonable judgment of Tenant, be dangerous to or prejudicial to the safety of to any Hotel guests or employees or others in the Hotel or the Premises may be denied access to the Building or may be ejected therefrom. In case of invasion, riot, public excitement or other commotion Tenant may prevent all access to the Building during the continuance of the same, by closing the doors or otherwise, for the safety of the Hotel guests, tenants and other occupants and protection of property in the Building. Tenant shall, in no way, be liable to Manager for damages or loss arising from the admission, exclusion or ejection of any person to or from the Restaurant or the Building under the provisions of this rule.

3.  [Omitted.]

4.  No window or other air-conditioning units shall be installed by Manager without Tenant's consent.

5.  There shall not be used in any space, nor in the public halls of the Building, either by any Manager or by jobbers, or other in the delivery or receipt of merchandise, any hand trucks, except those equipped with rubber tires and side guards.

6.  All entrance doors in each Manager's Restaurant shall be left locked when the Manager's Restaurant are not in use. Entrance doors shall not be left open at any time.

7.  No noise, including the playing of any musical instruments, radio or television, which, in the judgment of Tenant, might disturb Hotel guests or tenants or other

197178-11w



EXHIBIT E

Diagram of Back Yard Area Usable by Manager

{ATTACHED}

EXHIBIT F

Indemnification Procedures

(a) If a claim (a "Claim") is to be made by a person entitled to indemnification hereunder, the person claiming such indemnification (the "Indemnified Party"), shall be given written notice (a "Claim Notice") to the indemnifying person (the "Indemnifying Party")as soon as practicable after the Indemnified Party becomes aware of any fact, condition or event which may give rise to damages, liabilities, losses, damages, fines, penalties, or expenses, including, without limitation, attorneys' fees and disbursements (collectively, "Losses") for which indemnification maybe sought under this Agreement. The failure of any Indemnified Party to give timely notice hereunder shall not affect rights to indemnification hereunder, except and only to the extent that, the Indemnifying Party demonstrates actual material damage or prejudice caused by such failure.

(b) In the case of a Claim involving the assertion of a claim by a third party, whether pursuant to a lawsuit or other legal action or otherwise (a "Third Party Claim"), if the Indemnifying Party acknowledges in writing to the Indemnified Party that the Indemnifying Party is obligated to indemnify the Indemnified Party hereunder, then (A) the Indemnifying Party shall be entitled and, if it so elects, shall be obligated at its own cost and expense (1) to take control of the defense and investigation of such Third-Party Claim and (2) to pursue the defense thereof in good faith by appropriate actions or proceedings promptly taken or instituted and diligently pursued, including, without limitation, to employ and engage attorneys of its own choice reasonably acceptable to the Indemnified Party to handle and defend the same, and (B) the Indemnifying Party shall be entitled (but not obligated), if it so elects, to compromise or settle such Claim, which compromise or settlement shall be made only with the written consent of the Indemnified Party, such consent not to be unreasonably withheld or delayed. In the event the Indemnifying Party elects to assume control of the defense and investigation of such lawsuit or other legal action in accordance with this Exhibit F, the Indemnified Party may, at its own cost and expense, participate in the investigation, trial and defense of such Third-Party Claim; provided that, if the named persons to a lawsuit or other legal action include both the Indemnifying Party and the Indemnified Party and the Indemnified Party has been advised in writing by counsel and such counsel reasonably determines that there may be one or more legal defense available to such Indemnified Party that are different from or additional to those available to the Indemnifying Party, the Indemnified Party shall be entitled to separate counsel reasonably acceptable to the Indemnifying Party and at the Indemnifying Party's reasonable cost and expense (including the reasonable fees and expenses of counsel).

(c) If the Indemnifying Party fails to assume the defense of such Third-Party Claim in accordance with this Exhibit F and notify the Indemnified Party that it intends to do so within 20 calendar days after receipt of the Claim Notice, the Indemnified Party against which such Third-Party Claim has been asserted shall (10 days after delivering notice to such effect to the Indemnifying Party) have the right to engage counsel reasonably acceptable to the Indemnifying Party to undertake the defense, compromise and settlement of such Third-Party Claim on behalf of and for the account of the Indemnifying Party at the Indemnifying Party's reasonable cost and expense (including the reasonable fees and expenses of counsel) unless

within such 10 day period the Indemnifying Party delivers a notice to the Indemnified Party of the Indemnifying Party's intention to defend; provided that such Third-Party Claim shall not be compromised or settlement without the written consent of the Indemnifying Party, which consent shall not be unreasonably withheld or delayed. In the event the Indemnifying Party assumes the defense of the Claim, the Indemnifying Party shall keep the Indemnified Party reasonably informed of the progress of any such defense, compromise or settlement, and in the event the Indemnified Party assumes the defense of the Claim, the Indemnified Party shall keep the Indemnifying Party reasonably informed of the progress of any such defense, compromise or settlement.

    (d) The parties shall use commercially reasonable efforts to minimize Losses from Third-Party Claims and shall act in good faith in responding to, defending against, settling or otherwise dealing with such Claims, notwithstanding any dispute as to liability as between the parties under this Agreement. The parties shall also cooperate in any such defense, give each other reasonable access to all information relevant thereto and use commercially reasonable efforts to make employees and other representative available on a mutually convenient basis to provide additional information and explanation of any material provided in connection therewith. The Indemnifying Party shall be liable for any settlement of any Third-Party Claim effected pursuant to and in accordance with this Exhibit F and for any final judgment (subject to any right of appeal), and the Indemnifying Party agrees to indemnify and hold harmless each Indemnified Party from and against any and all damages by reason of such settlement or judgment.

occupants in the Building, shall be made or permitted by any Manager. No dangerous, inflammable, combustible or explosive object, material or fluid shall be brought into the Building by Manager.

8.   All damages resulting from any misuse of the plumbing fixtures shall be borne by Manager if its servants, employees, agents, visitors or licensees, shall have caused the same.

9.   No additional locks or bolts of any kind shall be placed upon any of the doors or windows in Manager's Restaurant and no lock on any door therein shall be changed or altered in any respect. Duplicate keys for the Restaurant and toilet rooms shall be procured only from Tenant, which may make a reasonable charge therefore. Upon the termination of Manager's agreement with Tenant, all keys of the Restaurant and toilet rooms shall be delivered to Tenant.

10.   Manager, shall, at its expense, provide artificial light in the Restaurant for Tenant's agents, contractors and employees while making repairs or alterations in said Restaurant.

11.   Any vending machines which are installed in the Restaurant shall be for the use of Manager's employees and customers only. Manager shall not be permitted to install any "arcade" type machines.

12.   No animals or birds, bicycles, mopeds or vehicles of any kind shall be kept in or about the Building or permitted therein.

13.   No furniture, equipment, packages or merchandise will be received in the Building or carried up or down in the elevator, except between such hours as shall be designated by Tenant. Neither Owner nor Tenant shall charge Manager for the use of the freight elevator, but Tenant may prescribe the method and manner in which any inventory, merchandise, heavy furniture, equipment or safes shall be brought in or taken out of the Building, and also the hours at which such moving shall be done. No furniture, equipment, merchandise, large packages or parcels shall be moved or transported in the passenger elevators at any time.

14.   The exterior windows and doors that reflect or admit light and air into any Restaurant or the halls, passageways or other public places in the Building, shall not be covered or obstructed by any Manager, nor shall any articles be placed on the windowsills.

15.   Canvassing, soliciting and peddling in the Building is prohibited and Manager shall cooperate to prevent same.

16.   Manager shall not generate, store, handle, discharge or otherwise deal with any hazardous or toxic waste, substance or material or oil or pesticide on or about the Land.

197178-11w                                             X

EXHIBIT A

Diagram of Restaurant Premises

[Attached]


Diagram of Area of Plaza Permitted to be Used by Manager


[To be prepared by Manager, approved by Tenant and attached after approval by Tenant.]

197178-11w

## EXHIBIT B

## MANAGER'S INITIAL WORK

Manager shall, at its expense, perform the following work and installations ("Manager's Initial Work"), at Manager's sole cost and expense:

## [BLUEPRINTS, DRAWINGS, AND ITEMIZED WORK SCHEDULE ATTACHED]

Manager shall use reasonable efforts to complete its Initial Work within **ninety (90)** days but such Initial Work shall in all events be completed within **one hundred fifty (150)** days of the Commencement Date.

EXHIBIT C

REQUIREMENTS FOR PLANS AND SPECIFICATIONS
(Other than Decorative Alterations)

Manager shall submit two (2) sepias and four (4) prints each (as well as the mylars specified in subparagraph (xx) below, and one (1) additional sepia if structural engineering is anticipated) of final and completed dimensioned and detailed Plans and Specifications. Plans and Specifications shall also be submitted in CADD format on disk. The Plans and Specifications must comply with all Legal Requirements. The Plans and Specifications shall be stamped and sealed by Manager's architect and shall include the following:

(i)   Reflected ceiling layouts and locations, including exit lights and special area lighting specification for inclusion in engineer's contract documents.

(ii)   Equipment loads (Btu/hr., voltage, amperage, phase, watts, etc.) and requirements for general work stations, as well as special areas, such as telephone equipment rooms, copy rooms, edit rooms, etc.

(iii)   Areas requiring 24-hour air conditioning or areas requiring air conditioning after normal operating hours for the Building.

(iv)   Power and telephone layouts and locations.

(v)   Emergency power requirements, including specific electric equipment and air conditioning equipment.

(vi)   Temperature and humidity requirements for all special areas other than office spaces.

(vii)   Rooms to have individual zone control (VAV boxes, etc.).

(viii)   [illegible]

(ix)   Noise criteria and general heat design criteria for special areas.

(x)   Requirements for redundant air conditioning systems (communications rooms, computer rooms, etc.).

(xi)   Compressed air requirements, including SCFM, pressure, valving, etc. In addition, provide division of responsibility for specific equipment (*i.e.*, Tenant or contractor supplied).

(xii)   Equipment requiring special exhaust.

(xiii)  General conditions and special supplemental conditions for specifications.

(xiv)  Fire protection for special areas (preaction sprinkler, sprinkler, smoke and heat detectors, etc.).

(xv)  Raised floor areas, including heights of raised floors, etc.

(xvi)  Plumbing requirements (types of fixtures, etc.), including division of responsibility for specifying fixtures.

(xvii)  Paging requirements.

(xviii)  A full set of architectural drawings (including fire-rated wall sections, elevations, etc.).

(xix)  Security, data and audio/visual requirements (sizes).

(xx)  Wash-off, reverse reading, half-tone mylars, without dimensions, of the following drawings:

(1)  Three (3) per floor - reflected ceiling plan
(2)  One (1) per floor - power and telephone plan
(3)  One (1) per floor - construction plan (to be used for plumbing layout, if applicable)

(xxi)  Location and details of common corridor, if applicable.

(xxii)  Color and finish specifications.

(xxiii)  Any and all information as may be reasonably necessary to complete the Alterations in the Restaurant.

197178-11ʷ

viii

## EXHIBIT D

### Current Construction Insurance Requirements

## LIABILITY LIMITATIONS

A.    Comprehensive or Commercial General Liability Insurance written on an occurrence basis, to afford protection of $3,000,000 combined single limit for personal injury, bodily injury and/or death and Broad Form property damage arising out of any one occurrence; and which insurance shall include coverage for Restaurant-operations (including explosion, collapse and underground coverage), elevators, contractual liability, owner's and contractor's protective liability, and completed operations liability.

B.    Comprehensive Auto Liability Insurance covering the use of all owned, non-owned and hired vehicles with bodily injury and property damage coverage, all on a per occurrence basis, at a combined single limit of $1,000,000.

C.    Workmen's Compensation Insurance providing statutory benefits for contractor's employees and Employer's Liability Coverage in an amount not less than $100,000/$500,000/$100,000.

D.    Property coverage damage to or loss of use of contractor's equipment.


## CERTIFICATE HOLDER

   150 East 34th Street Co., LLC
   c/o Manhattan East Suite Hotels
   500 West 37th Street
   New York, New York 10018-1103

## ADDITIONAL INSUREDS

   150 East 34th Street Restaurant Management Co., LLC
   c/o Manhattan East Suite Hotels
   500 West 37th Street
   New York, New York 10018-1103

In addition to listing each of the Additional Insured parties, as noted above, the Certificate of Insurance, general liability form, shall state that "The General Aggregate limitation is applied separately to each project."

The name and address of the Additional Insureds shall appear on the Certificate of Insurance. The insurance agent's address and telephone number is also required.


197178-11w                                      viii

150 EAST 34th STREET RESTAURANT MANAGEMENT CO., LLC
150 East 34th Street
New York, New York

May 15, 2002

Mr. John Hawkins
530 East 76th Street
New York, New York  10021

Dear John:

150 EAST 34th STREET RESTAURANT MANAGEMENT CO., LLC (the "Company") is delighted that you (including any successor or assign permitted under this Agreement to replace you, the "Consultant") have agreed to serve as a consultant to the Company on the terms set forth below.

1.     Certain Defined Terms.  Capitalized terms used in this letter agreement (this "Agreement") that are not otherwise expressly defined in this Agreement shall have the meanings ascribed to such terms in that certain Agreement For Hotel Restaurant Management Services, of even date herewith, by and between Company and Lisa Restaurant, Inc., a New York corporation (the "Restaurant Management Agreement").

2.     Services.  Consultant agrees to serve as an assistant vice president of the Company during the term of this Agreement, and in such capacity will (i) advise the Company on the administration of the Restaurant Management Agreement, (ii) advise the Company on the management and operation of the Restaurant, (iii) remit or disburse proceeds from the operation of the Restaurant deposited in a Company account by the Manager and otherwise perform the duties of the Company or Consultant that are specified in Section 1 of the Restaurant Management Agreement, and (iv) distribute, from time to time (as determined by Consultant) the Gross Liquor Revenues to himself as a fee for his services (the "Consultant Fee").  Consultant will provide no other services to the Company except those set forth above and shall have no authority to represent or bind the Company except in connection with performance of the services described in clauses (iii) and (iv) above.  Company acknowledges that, as of the date hereof, Consultant is the sole owner of the Manager and will be managing and working at the Restaurant for Manager.  Consultant shall be required to devote only such time as is reasonably required to perform the duties required of him under this Agreement, which the parties expect to be less than seven (7) hours per week on average.  Company will make Consultant a mandatory signatory on the Company's checking account into which the revenues of the Restaurant are deposited by Manager as required by the Restaurant Management Agreement and on the Sales Tax Account (as such term is defined in the Restaurant Management Agreement), in order that Consultant may more easily perform his duties under this Agreement.  With respect to such accounts, the Company and Consultant shall abide by the further terms and conditions specified in Exhibit A attached hereto.  Company will not revoke Consultant's signatory power over such

196140-8w

accounts without Consultant's prior written consent. However, Company may create and utilize other accounts over which Consultant has no signatory authority.

3.   Compensation.   The Consultant Fee is payable by the Company hereunder in consideration of all of Consultant's services hereunder. The obligation to pay the Consultant Fee shall terminate upon the termination of the Restaurant Management Agreement or this Agreement, whichever is earlier.

4.   Term of the Agreement.   The term of this Agreement (the "Term") shall commence as of the date set forth above and shall continue for the Term of the Restaurant Management Agreement, unless earlier terminated in accordance with the provisions of Section 6 hereof. The termination of this Agreement by either party hereto shall not affect, restrict, diminish or remove any rights, obligations or remedies held by either party arising under the terms of this Agreement up to and through the effective date of termination hereof.

5.   Relationship.   Consultant expressly acknowledges that Consultant is acting solely as an independent contractor hereunder and is not authorized to execute any agreements or otherwise bind the Company or to act, or to represent or imply to others that Consultant is empowered to act, other than as expressly set forth herein. This Agreement shall not be construed as creating any partnership, joint venture or any other form of joint operation or organization wherein the parties hereto are deemed to be partners. Consultant shall be responsible for all of Consultant's taxes and benefits relating in any manner to this Agreement and shall indemnify the Company for any loss or expense directly or indirectly resulting from any governmental or other third party actions based thereon. Any reimbursement of Consultant's ordinary business and approved travel expenses must be expressly agreed upon in advance and will be paid upon submission of reasonable documentation of the out-of-pocket expenses actually incurred.

6.   Termination.   Notwithstanding any provision of this Agreement to the contrary, this Agreement will terminate automatically without the necessity of any further action by either party hereto upon (i) the termination or expiration of the Restaurant Management Agreement, or (ii) if earlier, upon a material breach of the provisions of Section 9 hereof which is not cured within thirty (30) days after receipt by Consultant of written notice thereof.

7.   Severability.   If any provision of this Agreement shall be held to be invalid, illegal or unenforceable for any reason whatsoever, the validity, legality and enforceability of the remaining provisions of this Agreement shall not in any way be affected or impaired thereby.

8.   Notices.   All notices, claims, certificates, requests, demands and other communications hereunder shall be in writing and shall be deemed to have been duly given if delivered or mailed (registered or certified mail, postage prepaid, return receipt requested) or transmitted by nationally recognized courier service to the respective addresses set forth on the first page hereof or to such other address as the person to whom notice is to be given may have previously furnished to the other persons in writing in the manner forth above, or if delivered personally to Consultant at the Restaurant Premises.

9.  Transfer.

(a)  Except as provided in Section 9(b) of this Agreement, this Agreement, and Consultant's rights and obligations hereunder, may be assigned or transferred only in connection with an assignment or transfer of the Restaurant Management Agreement by Manager made in accordance with the terms and conditions of the Restaurant Management Agreement, and further, this Agreement, and Consultant's rights and obligations hereunder shall be assigned or transferred in connection with such an assignment or transfer to the principal owner of the assignee or transferee of the Restaurant Management Agreement.

(b)  Manager may appoint an individual to assume Consultant's duties hereunder to take effect upon Consultant's death or disability, and such individual may assume such duties at such time and continue to perform them hereunder as a replacement of Consultant, provided that such appointee shall be first approved by Company, in its sole but reasonable discretion. Any such appointment and approval shall be set forth in writing and may be revoked at any time by Manager with written notice to the Company.

(c)  Consultant acknowledges that the Company has entered into this Agreement with him because of his status as the owner of Manager. Consultant shall not assign or transfer any of his stock in the Company, nor cause the issuance of stock or other securities in the Company such that he has less than fifty one percent ownership and management interest in the Company, nor shall he grant any approval or veto rights to any stockholders or security holders of the Manager after the date hereof over management decisions of the Manager, nor cease to act as the President or chief executive officer of the Manager, in each case without the prior written consent of Company, which consent shall be within its sole and absolute discretion, unless any such actions or is to be effected in connection with a sale of all or substantially all of the stock in the Manager, in which case Company's consent thereto shall be governed by the provisions of Article 30 of the Management Agreement.

10.  Representation. Consultant hereby represents and warrants that, to the best of his belief, he meets all eligibility criteria for inclusion under the Company's liquor license and that he knows of no reason why the New York State alcoholic beverage authorities (the "Authority") would deny his inclusion as an authorized licensee under the Company's liquor license. If the Authority finds that Consultant is ineligible for inclusion under the Company's liquor license, this Agreement shall terminate and be of no further force and effect and neither party will have any claim against the other with respect to termination on such grounds. Consultant shall cooperate with the Company in seeking to obtain its liquor license and shall submit fingerprints and information required by the Authority in connection with Tenant's application for a liquor license or any modification thereof.

11.  Miscellaneous. This Agreement contains the entire understanding relating to its subject matter and is binding on the parties and their respective heirs, representatives, successors and assigns. Neither this Agreement nor any provision hereof may be terminated, modified or amended unless in writing signed by both parties hereto. No waiver by any party, whether express or implied, of any provision of this Agreement, or of any breach or default, shall constitute a waiver of a breach of any similar or dissimilar provision or condition or shall be

196140-8w

3

effective unless in writing signed by the party against whom enforcement is sought. Each party understands this Agreement and has been advised by counsel, to the extent such party deems desirable, prior to entering into this Agreement. This Agreement shall be governed by, and construed in accordance with, the internal laws of the State of New York without giving effect to principles of conflicts-of-law. Each party agrees that any action or proceeding relating to this Agreement may be instituted against such party in any appropriate court in the State of New York, hereby irrevocably submits to the jurisdiction and venue of the State and Federal courts of the State of New York, and agrees that service of any process, summons, notice or document by U.S. certified or registered mail to the address of Consultant shall be effective service of process for any action, suit or proceeding brought in any such court.. This Agreement may be signed in counterparts, each of which shall be deemed an original and by facsimile.

Please sign and return the enclosed copy of this letter to confirm our understanding. We look forward to working with you.

Very truly yours,

150    EAST    34th    STREET    RESTAURANT
MANAGEMENT CO., LLC

By: _____

Name:
Title:


Accepted and Agreed as of
the date first written above:

_____
JOHN HAWKINS

## EXHIBIT A

### Certain Terms Relating to the Account Required to Be Utilized
### Under the Restaurant Management Agreement

Article 1 of the Restaurant Management Agreement requires the establishment of a certain bank account to exclusively receive all of the proceeds of the operation of the Restaurant by Manager (the "Revenue Account") and a Sales Tax Account to accumulate funds for the timely payment of sales and excise taxes with respect to Restaurant operations and to use as a source of payment of such liabilities. In connection with those accounts, the Company and Consultant agree as follows:

The accounts will be established pursuant to Company bank resolutions approved in writing by Consultant in his sole but reasonable discretion (which discretion shall include but not be limited to the approval of the bank and bank location).

No change may be made to the resolutions without Consultant's prior written consent. Each check or draft drawn on the account will require Consultant's signature either alone or in conjunction with other authorized persons first approved by Consultant.

The accounts may not be closed nor the terms thereof modified by the Company without Consultant's prior written consent.

Consultant will have exclusive custody of the checkbooks relating to the accounts, and Consultant will be the sole person authorized to order checks relating to the account.

Statements of activity in both the Revenue Account and the Sales Tax Account will be sent to Consultant at the Restaurant, and copies of the statements of the Sales Tax Account shall be promptly delivered to the office of the Company. Copies of the statements of activity in the Revenue Account will be promptly provided to the Company upon request if the Company requires them in connection with any inquiry or investigation by, application to, or demonstration of compliance with applicable laws and regulations of, the New York State authorities regulating the sales of alcoholic beverages, or if the Company otherwise requires copies thereof for reasonable business purposes.

No monies shall be deposited into the accounts other than from the operation of the Restaurant, and all revenues from the operation of the Restaurant shall be initially deposited into the Revenue Account.

AGREEMENT FOR PAYMENT OF BROKER FEES

This AGREEMENT FOR PAYMENT OF BROKERAGE FEES is entered into effective as of the _____ day of March, 2002 by and between 150 EAST 34th STREET RESTAURANT MANAGEMENT CO., LLC, a New York limited liability company ("Tenant"), and LISA RESTAURANT, INC., a New York corporation ("Manager").

WHEREAS, Tenant and Manager have entered into that certain Agreement For Hotel Restaurant Management Services, of even date herewith ("Management Agreement"), pursuant to which Manager will has agreed to manage and operate the Restaurant (as defined therein) for Tenant; and

WHEREAS, in connection therewith, the parties wish to set forth their agreement concerning obligations to pay broker fees;

NOW, THEREFORE, in consideration of the mutual covenants set forth herein and other good and valuable consideration, the receipt and sufficiency of whish are hereby acknowledged, the parties agree as follows:

1.      Each of Tenant and Manager represents and warrants to the other that it has not dealt with any broker or agent in connection with the negotiation or execution of the Management Agreement other than Newmark New Spectrum and Edward Kamenitzer Real Estate, whose commissions shall be paid by Tenant or Tenant's owner, 154 East 34th Street Co., LLC, pursuant to one or more separate written agreements. Tenant and Manager shall each indemnify the other against all costs, expenses, attorneys' fees, liens and other liability for commissions or other compensation claimed by any broker or agent claiming the same by reason of having dealt with the indemnifying party.

2.      This Agreement shall be governed by New York law without regard to its principles of conflicts of law, and shall be binding on and inure to the benefit of the parties' respective successors and assigns. This Agreement may be executed and delivered in counterparts and as so executed and delivered shall be fully effective and binding on the parties hereto.

IN WITNESS WHEREOF, the parties hereto have executed and delivered this Agreement as of the date first written above.

TENANT:
150 EAST 34TH RESTAURANT MANGEMENT CO., LLC,
Tenant

By: _____
Name:
Title:


MANAGER:
LISA RESTAURANT, INC., Manager


By: _____
John Hawkins, President


198551-3w

<u>GUARANTY</u>

GUARANTY dated as of May 15, 2002 by JOHN HAWKINS having a residence at 530 East 76th Street, New York, NY 10021 ("Principal" or "Guarantor").

<u>RECITALS</u>

A.    Lisa Restaurant, Inc. ("Manager") is a party to an Agreement for Hotel Restaurant Management Services ("Management Agreement"), with 150 East 34th Street Restaurant Management Co., LLC ("Tenant"), whereby Manager agrees to manage and operate a restaurant at the restaurant premises leased by the Tenant from 150 East 34th Street Co., LLC, located in the Dumont Plaza Hotel at 150 East 34th Street, New York, New York (the "Restaurant Premises").

B.    Tenant has requested Principal to guaranty to Tenant that if Manager defaults under the Management Agreement beyond any notice and cure periods provided with respect thereto under the terms of the Management Agreement, upon which Tenant exercises its right under the Management Agreement to terminate the Management Agreement, Manager will cease management and operation of the Restaurant (as such term is defined in the Management Agreement), and vacate the Restaurant Premises, and to personally guaranty, to the extent provided below, the timely payment of all Tenant Fixed Fees and Additional Charges (as such terms are defined in the Management Agreement) owed by Manager until Manager has ceased operation of the Restaurant and surrendered the Restaurant Premises, as provided for herein.

C.    Accordingly, Principal agrees as follows:

1.    Principal guarantees to Tenant (a) the payment and performance of Manager's obligations under and in accordance with the Management Agreement to pay (i) all Tenant Fixed Fees incurred through the Cutoff Date (as defined below), (ii) insurance as provided in Article 9 of the Management Agreement incurred through the Cutoff Date, and (iii) "Managers Proportionate Share" of any increase in "Taxes" (as such terms are defined in the Management Agreement) as provided in Article 28 of the Management Agreement and to the extent that they are not otherwise included in the Tenant Fixed Fee, incurred through the Cutoff Date, (b) the payment, within thirty days of delivery, of all amounts owed for the purchase of alcoholic beverages for the Restaurant (as defined in the Management Agreement) incurred through the Cutoff Date (as defined below), and (c) the timely payment of all applicable sales taxes owed on purchases of food, alcoholic beverages and other beverages for or by the Restaurant incurred through the Cutoff Date (any or all of such obligations hereinafter the "Obligations"). This is a guaranty of payment and not only of collection. Guarantor's liability pursuant to this Guaranty shall be limited to the sum of Obligations which accrue up to the date that is the last to occur of: (a) Manager vacating the Restaurant Premises; (b) Manager removing or abandoning its property from the Restaurant Premises; or (c) Manager delivering the keys to Tenant and surrendering the Restaurant Premises, provided that the Manager has given Tenant not less than thirty days prior written notice that it will surrender possession of the Restaurant Premises (the date on which the last of the foregoing events occurs herein referred to as the "Cutoff Date." Tenant may, at its option, proceed against Principal and Manager, jointly and severally, or Tenant may proceed against Principal under this Guaranty without commencing any suit or proceeding of any kind against Manager or, without having obtained any judgment against Manager.

2.    Except as expressly provided in Section 16 or other provision hereof, the obligations of Principal under this Guaranty are unconditional, are not subject to any set-off or defense based upon any claim Principal may have against Tenant, and will remain in full force and effect without regard to any

1

197680-5w

circumstance or condition, including, without limitation: (a) any modification or extension of the Management Agreement (except that the liability of Principal hereunder will apply to the Management Agreement as so modified or extended); (b) any exercise or non-exercise by Tenant of any right or remedy in respect of the Management Agreement, or any waiver, consent or other action, or omission, in respect of the Management Agreement; (c) any transfer by Tenant or Manager in respect of the Management Agreement or any interest in the Restaurant Premises; (d) any bankruptcy, insolvency, receivership, reorganization, composition, adjustment, dissolution, liquidation or other like proceeding involving or affecting Tenant or Manager or their obligations, properties or creditors, or any action taken with respect to such obligations or properties or the Management Agreement, by any trustee or receiver of Tenant or Manager, or by any court, in any such proceeding; (e) any personal defense such as a discharge in bankruptcy to the liability or obligations of Manager under the Management Agreement; or (f) any transfer by Principal of any or all of the capital stock of Manager or the control thereof.

3.     Principal waives presentment and demand for payment, notice of non-payment or non-performance, and any other notice or demand to which Principal might otherwise be entitled.

4.     Principal will reimburse Tenant for all costs and expenses incurred by Tenant in connection with the enforcement of or collection upon this Guaranty, including, without limitation, reasonable attorneys' fees to the extent Tenant's claims against Principal hereunder are found to be, held or treated as valid and effective. Similarly, Tenant will reimburse Principal for all costs and expenses incurred by Principal in defending against Tenant's claims hereunder to the extent that Principal's defenses thereto are found to be, held or treated as valid and effective.

5.     Should Tenant be obligated in any bankruptcy proceeding to repay to Manager or Principal or to any trustee, receiver or other representative of Principal any amounts previously paid, then this Guaranty shall be reinstated in the amount of such repayment. Tenant shall not be required to litigate or otherwise dispute its obligation to make such repayment if it in good faith on the advice of counsel believes that such obligation exists.

6.     Principal and Tenant each waive trial by jury of all issues arising in any action, suit or proceeding to which Tenant and Principal may be parties in connection with this Guaranty.

7.     Principal, at its expense, will execute, acknowledge and deliver all instruments and take all action as Tenant from time to time may reasonably request for the assuring to Tenant the full benefits intended to be created by this Guaranty.

8.     No delay by Tenant in exercising any right under this Guaranty nor any failure to exercise the same will waive that right or any other right.

9.     Any notice or other communication hereunder must be in writing and will be deemed duly served on the date it is mailed by registered or certified mail in any post office station or letter box in the continental United States, addressed if to Principal, to the address of Principal set forth herein or such other address as Principal shall have last designated by notice to Tenant, and addressed if to Tenant, to it at the address set forth above or such other address as Tenant shall have last designated by notice to Principal.

10.     This Guaranty may not be modified or terminated orally or in any manner other than by an agreement in writing signed by Principal and Tenant, or their respective successors and assigns.

197680-5w

2

11.    This Guaranty and any issues arising hereunder will be governed by the laws of the State of New York, and Principal consents to the jurisdiction of the Courts of the State of New York, concerning all issues arising hereunder.

12.    All remedies of Tenant by reason of this Guaranty are separate and cumulative remedies and no one remedy, whether exercised by Tenant or not, will be in exclusion of any other remedy of Tenant and will not limit or prejudice any other legal or equitable remedy which Tenant may have.

13.    If any provision of this Guaranty or the application thereof to any person or circumstance will to any extent be held unenforceable, the remainder of this Guaranty or the application of such provision to persons or circumstances other than those as to which it is held unenforceable, will not be affected thereby, and each provision of this Guaranty shall be valid and enforceable to the fullest extent permitted by law.

14.    This Guaranty will inure to the benefit of and may be enforced by Tenant and its successors or assigns, and will be binding upon and enforceable against Principal and its successors, assigns, heirs and personal representatives. If there is more than one Principal, Principal's obligations and liabilities under this Guaranty will be joint and several.

15.    Nothing in this Agreement is intended to or shall provide Manager with a right to terminate the Management Agreement by surrendering the Restaurant Premises as provided in this Agreement.

16.    Principal's guaranty hereunder will terminate and come to an end as to all Obligations thereafter accruing upon the assignment of the Management Agreement or of all of Principal's interests in the Manager in accordance with the terms and conditions of the Management Agreement and the concomitant execution and delivery of a guaranty in form and substance substantially similar to this Guaranty by a principal of the permitted assignee (in the case of an assignment of the Management Agreement) or one or more of the permitted assignees (in the case of an assignment of Principal's interests in Manager).

IN WITNESS WHEREOF, Principal has duly executed this Guaranty as of the day and year first above written.

JOHN HAWKINS

Social Security Number [Federal ID Number]

197680-5w                                                    3

STATE OF NEW YORK          )
                           ) ss.:
COUNTY OF NEW YORK         )

On this __ day of March in the year 2002, before me, the undersigned, a Notary Public in and said State, personally appeared JOHN HAWKINS, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.



_____
Notary Public

197680-5w                                        4